# EXHIBIT 3

BODUM USA, INC., a Delaware corporation, §
§
Plaintiff, §
§
v. § No. 1:16-cv-02916
§
A TOP NEW CASTING INC. § Honorable Matthew F. Kennedy
§
Defendant. §
§

### EXPERT REPORT OF ROBERT JOHN ANDERS, IDSA

## I. INTRODUCTION

1.  My name is Robert John Anders. I am the owner of Robert Anders, A Design Consultancy in Warwick, N.Y. My business address is 78 Continental Road, PO Box 609, Warwick, N.Y. 10990-0609. I have been involved in the industrial design field for more than fifty years. I am over 18 years of age and I would otherwise be competent to testify as to the matters set forth herein if I am called upon to do so at trial, hearing or deposition.

2.  I have been retained as an industrial design expert witness in this case by Vedder Price, P.C., counsel for the Plaintiff, Bodum USA, Inc., (hereinafter "Bodum") to opine on whether certain commercial product(s) labeled "SterlingPro Coffee Press" produced by Defendant, A Top New Casting Inc. (hereinafter "A Top") infringe the trade dress of Bodum's CHAMBORD® French Press product. The products that Bodum believes infringes their trade dress are:

    2.1. a "Coffee Press" product branded in a package as "SterlingPro" and having a metal frame with four (4) support legs, and

2.2. a "Coffee Press" product branded in a package as "SterlingPro" and having a metal frame with three (3) support legs.

3. I have previously served as an expert witness in the following cases on behalf of Bodum:

3.1. Meyer Intellectual Properties Ltd. et al . v. [Bodum, Inc.];

3.2. [PI Design AG and Bodum, U.S.A. Inc.] v. Trudeau Corporation, Inc.;

3.3. [PI Design AG and Bodum, U.S.A. Inc.] v. Mr. Coffee; and

3.4. [Bodum U.S.A. Inc.] v. Palm Restaurant, Inc. and the TJX Companies, Inc..

4. My background, education and qualifications are set forth in Section II below and in my *Curriculum Vitae* attached as Exhibit A to this Report. Section III sets forth an overview of materials reviewed in forming my expert opinions. Section IV sets forth my working knowledge of applicable laws. Section V sets forth some industrial design terminology. Section VI sets forth my examination of coffee presses in the marketplace. Section VII is my design analysis of the Bodum Original French Press. Section VIII is my visual comparison of the Bodum product with the accused A Top products. Section IX sets forth the likelihood of confusion that the A Top product(s) would be confused with the "Original French Press Bodum" product. Section X sets forth my conclusions. Section XI contains my further remarks.

## II. BACKGROUND, EDUCATION, AND QUALIFICATIONS

5. I am a resident of Warwick, New York, have been an Industrial Designer[1] for more than fifty (50) years, and have experience in both the practical and academic areas of the industrial design field, which is detailed in my Curriculum Vitae attached as Exhibit A.

---

[1] "Industrial Design (ID) is the professional service of creating products and systems that optimize function, value and appearance for the mutual benefit of both user and manufacturer. Industrial designers develop products and systems through collection analysis and synthesis of data guided by the special requirements of the client and manufacturer. They prepare clear and concise recommendations through drawings, models, and descriptions. Industrial designers improve as well as create, and they often work with multidisciplinary groups that include management, marketing, engineering and manufacturing specialists." http://www.idas.org/education/what-is-industrial-design.

6. In August of 2000, I retired as a tenured Professor of Industrial Design from Pratt Institute, one of the largest and most prestigious schools of Art, Design and Architecture in the United States. I had been a member of the faculty at Pratt since 1988.

7. Throughout my teaching career, I developed a wide variety of course materials related to industrial design and ergonomics. I authored nineteen papers that were published and /or presented to professional societies and organizations. A listing of my publications is contained in Exhibit B.

8. Among the many courses I taught were those involving consumer product design as well as ergonomics, *i.e.*, the relationship of people to both products and environments. For example, I taught a graduate industrial design course titled: *Ergonomics*. The following year, I modified the course and with a co-author, Daniel Fechtner, MD, Assistant Professor of Clinical Rehabilitation Medicine, College of Physicians and Surgeons, Columbia University, created a new graduate course titled, *Universal Design.* The curriculum that Dr. Fechtner and I co-authored was sold nationally by the Industrial Designers of America (IDSA) and I was subsequently told that it was integrated into the Industrial Design departments at seven universities. I also attended the annual housewares tradeshow in Chicago for at least three years.

9. In another course involving the design of products, I taught students how to design products using CATIA® a sophisticated Computer Aided Design (CAD) program. I then received a $50,000. grant from IBM to write a CATIA® *User Manual for Industrial Designers*.

10. In another course, I taught students how to design products using CADKEY, a CAD program that ran on a Windows® platform PC.

11. I also lectured and/or taught Design at the following institutions:

    11.1. Limkokwing Institute for Creative Technology, Kuala Lumpur, Malaysia;

    11.2. University of Southwestern Louisiana, School of Architecture, Lafayette, Louisiana;

    11.3. Miami University, Miami, Ohio;

11.4.    University of Industrial Arts, Graduate Industrial Design Department, Helsinki, Finland;

11.5.    High School of Art & Design, Industrial Design Department, New York;

11.6.    Department of Interior Design, Pratt Institute;

11.7.    Cooper Hewitt Museum, New York;

11.8.    Pratt Summer Semester Course at the University of Seville, Spain; and

11.9.    Department of Industrial Design, University of Essen, Essen, Germany.

12.    I was founder and Head of the Design Management Program at Pratt, which was the first and then only graduate program in the United States awarding a master's degree in design management.  I also created and was Head of the Graduate Arts & Cultural Management Program at Pratt.  I had previously served as Acting Associate Dean of the School of Art and Design.  In 1995, I was elected by my peers to a three-year term as President of the Academic Senate at Pratt Institute.

13.    I majored in Industrial Design at one of New York City's elite public high schools and the largest high school (6,000 boys) in the United States, Brooklyn Technical High School, from 1948 to 1950.

14.    After enrolling in Pratt Institute in 1950, I also majored in industrial design. However, in 1952 during the Korean War, I had my student deferment from Selective Service canceled and I volunteered to serve in the United States Navy from 1952 to 1956.  I served as an aerial photographer (PHA/2); a deep-sea diver (Diver/2) on the Amphibious Force Command Ship, USS Mount McKinley, AGC 7; and a scuba diver and underwater photographer (PHA/1) as a member of the Pacific Fleet Combat Camera Group, in operations with UDT-1 (Underwater Demolition Team), UDOM-1 (Underwater Demolition and Ordinance Materiel) and the British Royal Navy Underwater Demolition Team (Hong Kong).

15.    After four years of military service, I returned to Pratt Institute to complete my education in Industrial Design.

16.    In 1958, I graduated with a Bachelor of Industrial Design (BID) degree.  At graduation, I was awarded the Industrial Design Department's highest honor: the *Dean's Medal*.

17. After graduation from Pratt, I spent thirty years in the industrial design profession in a variety of senior design management positions, in design consultancies; as head of my own consultancies; as well as serving as a senior design executive at two major corporations, Bristol-Myers Company and Revlon, Inc.

18. While at Bristol-Myers, I was the corporate member of the corporate wide technical packaging committee, and also designed packages for both corporate and the Bristol-Myers Products division. I was also involved in the creation of product branding as well as corporate branding, having personally created the trademark for Bristol-Myers, now Bristol-Myers Squibb.

19. Since 1990, I have served as an Expert Witness in 23 Trade Dress cases. Exhibit C provides additional information regarding this work, and lists the cases wherein I testified as an expert in industrial design over the past four years.

20. I am a member of the:

    20.1. Industrial Designers Society of America #19785 (**IDSA**);

    20.2. Human Factors and Ergonomics Society #12595 (**HFES**); and the

    20.3. Architectural Woodworking Institute #30421 (**AWI**).

21. As a result of my knowledge, background, and experience, I am skilled in the art of industrial design, including those aspects relating to the design of consumer products.

22. My time in this matter is billed at a rate of $425.00 per hour and my compensation is not dependent upon the outcome of this case.

## III. OVERVIEW OF MATERIALS REVIEWED IN FORMING MY EXPERT OPINIONS

23. As set forth herein, my expert opinions are based upon my knowledge, background and experience, and my review of the materials listed below:

    23.1. Complaint for Infringement of Trade Dress and Unfair Competition, dated March 7, 2016;

    23.2. a packaged product labeled "The original FRENCH PRESS bodum®" and packaged as "CHAMBORD, French Press®, bodum, The original FRENCH PRESS";

23.3.   a "Coffee Press" product branded in a package as "SterlingPro" and having a metal frame with four (4) support legs;

23.4.   a "Coffee Press" product branded in a package as "SterlingPro" and having a metal frame with three (3) support legs;

23.5.   a "Coffee Press" product depicted on the Amazon.com web site labeled: "SterlingPro French Coffee Press 8 Cup;

23.6.   a "CHAMBORD Bodum Coffee Press" depicted on the Amazon.com website;

23.7.   a "Coffee Press" product branded in a package as "SECURA 8-CUP FRENCH PRESS" Model#SFP-34DS;

23.8.   a "Coffee Press" product branded in a package as "Brillante Products BR-CP10350 Coffee French Press/Plunger";

23.9.   a "Coffee Press" product branded in a package as "FORLIFE Café Style Coffee/Tea/Press Item No. 827";

23.10.  a "Coffee Press" product branded in a package as "Utopia Kitchen Black Cafetiere";

23.11.  a "Coffee Press" product branded in a package as "SUMATRA DREAM French Press Coffee Maker";

23.12.  a "Coffee Press" product branded in a package as "GSI Outdoors 30 FL. OZ. JAVAPRESS";

23.13.  a "Coffee Press" product branded in a package as "Sterling Pro Pear Shape S/S DOUBLEWALL FRENCH PRESS";

23.14.  a "Coffee Press" product branded in a package as "Sterling Pro S/S Double Wall Cafetiere 1000 ml";

23.15.  a "Coffee Press" product branded in a package as "OSAKA Cafetiere Model Zenrin-Ji";

23.16.  a "Coffee Press" product branded in a package as "Groovy Peppers French Coffee Press 27 ounce (6 cups)";

23.17.  a "Coffee Press" product branded in a package as "OVENTE French Press FSF34CV";

23.18.  a "Coffee Press" product branded in a package as "VonChef Cafetiere with Coffee Spoon";

23.19.  a "Coffee Press" product branded in a package as "Francois et Mimi French Press";

23.20.  a "Coffee Press" product branded in a package as "SH&SH Stainless Steel French Coffee Press";

23.21.  a "Coffee Press" product branded in a package as "STANSPORT 3 Cup French Coffee Press";

23.22.  a "Coffee Press" product branded in a package as "LINKYO French Press Stainless Steel Coffee Maker";

23.23.  a "Coffee Press" product branded in a package as "OHMY Café Style Coffee & Tea Press 34 oz.  White Blanco";

23.24.  a "Coffee Press" product branded in a package as "KONA FRENCH PRESS 34 fl.oz/1000ml";

23.25.  *Traffix Devices, Inc. v. Marketing Displays, Inc.* (99-1571) 532 U.S. 23 (2001) 200 F.d 929, reversed and remanded;

23.26.  *Two Pesos, Inc. v. Taco Cabana, Inc.* (91-971), 505 U.S. 763 (1992);

23.27.  *Wal-Mart Stores, Inc. v. Samara Brothers, Inc.* 120 S.Ct. 1339 No. 99-150;

23.28.  *Georgia-Pacific Consumer Products LP v. Kimberly-Clark Corp* 647 F.3d 723;

23.29.  deposition transcript of Joergen Bodum, dated January 6. 2017;

23.30.  deposition transcript of Alain Grossenbacher, dated December 15, 2016;

23.31.  US D628,846 to Bodum, titled: *Beverage Maker*, issued Dec. 14, 2010;

23.32.  US D413,484 to Jorgensen, titled: *Lid For A Non-Electric Coffee Maker*, issued Sep. 7, 1999;

23.33.  US D386,040 to Jorgensen, titled: *Coffeemaker*, issued Nov. 11, 1997;

23.34.  US D378,261 to Jorgensen, titled*: Coffee Maker*, issued Mar. 4, 1997;

23.35.  *Jay Franco & Sons, Inc. v. Franek* 615 F.3d 855;

23.36.  Copies of pages bearing Bates Nos. B 01544-01547;

23.37.  Copies of pages bearing Bates BOD 0000477-480;

23.38.  Copies of pages bearing Bates Bodum_ATOP_00013603-13604;

23.39.  *Serv. Ideas v. Traex Corp*, 846 F.2d 1118.

23.40.  Agreed Protective Order, dated October 20, 2016, Acknowledge and Agreed to be Bound on February 6, 2017;

23.41.  Deposition Testimony of Jiang Liang, dated December 14, 2016;

23.42.  Deosition Testimony of Julieanne Drainville, dated December 6, 2016.

24.  It is my expert opinion that the Bodum CHAMBORD product has an overall appearance that is not based on "de jure" functionality features, and is therefore entitled to trade dress protection.

25.  It is my expert opinion that A Top "Coffee Press SterlingPro" product having a support frame having four (4) metal leg components infringes the trade dress of "The original French Press Bodum" product.

26.  It is my expert opinion that A Tops "Coffee Press SterlingPro" product having a support frame having three (3) metal leg components infringes the trade dress of "The original French Press Bodum" product.

## IV.  WORKING KNOWLEDGE OF APPLICABLE LAWS

27.  I am not a lawyer expert in regard to intellectual property laws.  I have acquired some limited knowledge of these laws as a result of classes I have taken, lectures and seminars I have attended, and from previously serving as an expert witness in twenty three previous cases concerned with Trade Dress law.

28.  My understanding of Trade Dress law is as follows:

28.1.  The "total image and overall appearance"[2] of a good that "may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques."[3]  I understand then that trade dress is the combination of the appearance of a product, the packaging, presentation of the packaged product at Point of Purchase (POP) and the advertisement of the product which together and in combination forms the trade dress of a product.

---

[2] *Two Pesos*, 505 U.S. at 764-65 n.1 (quoting Blue Bell Bio-Med. v. Cin-Bad, Inc., 864 F.2d 1253, 1256 (5th Cir. 1989))
[3] Id. quoting John H. Holland Co. v. Clarke Checks, Inc., 711 F.2d 966, 980 (11 CIR. 1983)

28.2. I understand that trade dress of the overall configuration of a product can be recognized only if the entire design is **nonfunctional**. If the design of the overall configuration is functional, then it may not receive trade dress protection. An inquiry therefore has to be performed to determine whether the overall design is functional or not.

28.3. I understand that if the infringer contends that the overall configuration of a product is functional, the nonfunctional elements alone, instead of the overall design, are capable of being considered for trade dress protection. Therefore, an inquiry has to be performed as to what if any features that constitute the trade dress are non-functional.

28.4. Because all articles of manufacture have a "**function**", the Textron court [4] explained the difference between "*de facto*" and "*de jure*" functionality.

28.4.1. "In essence, de facto functionality means that the design of a product has a function, i.e., a bottle of any design holds a fluid."

28.4.2. "De jure functionality, on the other hand, means that the product is in its particular shape because it works better in this shape…."

28.4.3. "[B]efore an overall product configuration can be recognized as a trademark, the entire design must be arbitrary or non de jure functional."

28.5. It is my understanding that a protectable product configuration may be infringed by another product where it is likely to cause confusion as to the origin of the product. **In other words, the appearance of a product identifies its' source.**

28.6. I understand that 15 U.S.C. § 1125(a) (3) states that: "In a civil action for trade dress infringement under this Act for trade dress not registered on the principal register, the person who asserts trade dress protection **has the burden of proving that the matter sought to be protected is not functional.** (Emphasis added)

---

[4] *Textron, Inc. v. U.S. Int'l Trade Comm'n*, 753 F.2d at 1025 (citations omitted, emphasis added, emphasis in original omitted).

28.7.    I also understand that as a result of the decision of the Supreme Court in
Wal-Mart Stores, Inc. v. Samara Brothers, Inc., a product cannot, by itself,
possess inherent distinctiveness.  A products design may be held as
distinctive only upon showing of it having acquired such distinctiveness
through secondary meaning.

28.7.1. I understand that trade dress protection can only be asserted after it
has been brought to the marketplace, and that if it has acquired
secondary meaning, it has done so over a period of time.
Furthermore, "secondary meaning, which occurs when, 'in the
minds of the public, the primary significance of a [mark] is to
identify the source of the product rather than the product itself'" [5].

28.7.2. In *Traffix Devices, Inc. v. Marketing Displays, Inc*., the Supreme
Court held, "The principal question in this case is the effect of an
expired patent on a certain claim of trade dress infringement.  A
prior patent, we conclude, has vital significance in resolving the
trade dress claim.  A utility patent is strong evidence that the
features therein claimed are functional.  If trade dress protection is
sought for those features the strong evidence of functionality based
on the previous patent adds great weight to the statutory
presumption that features are deemed functional until proved
otherwise by the party seeking trade dress protection.  Where the
expired patent claimed the features in question, one who seeks to
establish trade dress protection must carry the heavy burden of
showing that the feature is not functional, for instance by showing
that it is merely an ornamental, incidental, or arbitrary aspect of the
device." [6]

28.7.3. In other words, it is my understanding that it is the overall
appearance of the accused designed product with the product

_____

[5] 529 U.S. 205 (2000)
[6] 532 U.S.23, AT 29 (2001)

claiming trade dress protection that must be substantially similar to its overall appearance.

29.     In order to better understand the metes and bounds of trade dress, I present examples of one of the most iconic and recognizable product designs ever brought to market, the Volkswagen Beetle, whose trade dress is easily understood even though certain elements are purely functional, for example the wheels which must be round to function as wheels. Yet it is the overall appearance that is non-functional and the trade dress is immediately recognized even when the product appears in different colors, finishes and even has minor modifications to the rear window, handles and etc. Such minor alterations do not diminish the overall strength and recognition of the VW Beetle trade dress. The images below are from *The VW Beetle Story*, Giles Chapman, The History Press, Gloucestershire 2012.



**TABLE 1**

**THE VW BEETLE**

| 1938 | Late 1940's | 1949 |
|------|-------------|------|
| 1955 | 1969 | 1975 |



| 1980 | 2003 | 1998 |

30.     Accordingly, it is my opinion that changes in color or minor modifications to the forms do not detract from the overall appearance of a shape that is non-functional, since there is a plethora of car designs that are differently shaped, and the memorable uniqueness of the Beetle's form results in its' inherent trade dress.

## V.      INDUSTRIAL DESIGN TERMINOLOGY

31.     Since trade dress has been defined as the "look and feel" of a product, the question arises as to how we humans perceive objects and how can we objectively, critically, describe the objects under consideration.

32.     Silhouettes, or the outermost limits of three dimensional objects convey in a split second the overall shape of the underlying object and the initial -- and oftentimes the lasting-- impression an object leaves.  For example, the U.S. Military has for many years, taught silhouette recognition of aircraft, ships and other objects as the simplest and most direct way of object recognition and identification.

33.     A formalized methodology employed to discuss and analyze industrial designs in some schools use the terms: **Dominant**, **Subdominant** and **Subordinate** to distinguish the design elements and their relationship to each other.  This pedagogical methodology is conveyed in the book, *Elements of Design, Rowena Reed Kostellow and the Structures of Visual Relationships*, Gail Greet Hannah, Princeton Architectural Press, New York, NY. 2002.  Although the examples in the book are of abstract sculptures, the same principles and analysis was used consistently in analyzing and critiquing product designs while I was a student and later as a member of the faculty at Pratt Institute.  I will use this methodology in discussing the look and feel of the designs that are the subject of this report.

33.1.   "The dominant volume is the largest element, the most interesting and dramatic in character.  It occupies the dominant position in the group…"

33.2.   "The subdominant complements the dominant in character….. More often than not, the relationship is enhanced if the axes are not parallel."

33.3.   "The subordinate makes the design still more interesting by introducing a third visual element and axis."

34.   The dominant element or feature of a product contributes to its character, its essence, while the subdominant and subordinate elements contribute in supportive ways, but it is the cumulative effect of all of the visual features together that provides a total impression of the look and feel of a product.

## VI.   MY EXAMINATION OF COFFEE PRESSES IN THE MARKETPLACE

35.   My initial examination of the accused A Top product and the asserted Bodum product was a side by side comparison of the accused A Top product having four legs with the Bodum CHAMBORD products sent to me by Bodum's attorney, David Bennett.

36.   My subsequent examination of another accused A Top product and the asserted Bodum product was on the amazon.com website.  I replicate the SterlingPro page below on the left (see Exhibit D 1) and the Bodum CHAMBORD product page on the right (see Exhibit D 2).  The substantial similarity of the depicted products is visually striking.



37. I now undertake an analysis of similar products to the Bodum product to determine whether its design is the result of functional requirements (i.e., de jure functionality) or whether its functionality is "de facto".

38. In the table below, I photographically document the overall design of a variety of similar products to the "The original French Press Bodum" product in order to answer the question of whether the appearance of a coffee press is dictated by the functional features, or are the features "merely an ornamental, incidental, or arbitrary aspect of the device."[7]

## TABLE 2

### VISUAL EXAMINATION OF SELECTED COFFEE POTS WITH PLUNGERS CURRENTLY IN THE MARKETPLACE

| | | |
|---|---|---|
|  |  |  |
| "SECURA 8-CUP FRENCH PRESS" Model#SFP-34DS Purchased for $29.80. For an enlargement of this image, see Exhibit E 1. | "Brillante Products BR-CP10350 Coffee French Press/Plunger" Purchased for $25.90. For an enlargement of this image, see Exhibit E 2. | "FORLIFE Café Style Coffee/Tea/Press Item No. 827" Purchased for $60.55. For an enlargement of this image, see Exhibit E 3. |

---

[7] Lanham Trade-Mark Act, § 1 et seq., U.S.C.A. § 1051 et seq.

| | | |
|---|---|---|
|  |  |  |
| "Utopia Kitchen Black Cafetiere"  Purchased for $20.29.<br>For an enlargement of this image, see Exhibit E 4. | "SUMATRA DREAM French Press Coffee Maker"  Purchased for $28.37.<br>For an enlargement of this image, see Exhibit E 5. | as "GSI Outdoors 30 FL. OZ. JAVAPRESS"  Purchased for $34.99.<br>For an enlargement of this image, see Exhibit E 6. |
|  |  |  |
| "Sterling Pro Classic European Style S/S DOUBLEWALL FRENCH PRESS"  Purchased for $33.42.<br>For an enlargement of this image, see Exhibit E 7. | "Sterling Pro S/S Double Wall Cafetiere 1000 ml"  Purchased for $37.69.<br>For an enlargement of this image, see Exhibit E 8. | "OSAKA Cafetiere Model Zenrin-Ji"  Purchased for $27.70.<br>For an enlargement of this image, see Exhibit E 9. |

| | | |
|---|---|---|
|  |  |  |
| "Groovy Peppers French Coffee Press 27 ounce (6 cups")  Purchased for $17.63. For an enlargement of this image, see Exhibit E 10. | "OVENTE French Press FSF34CV"  Purchased for $39.01.  For an enlargement of this image, see Exhibit E 11. | "VonChef Cafetiere with Coffee Spoon"  Purchased for $26.94. For an enlargement of this image, see Exhibit E 12. |
|  |  |  |
| "Francois et Mimi French Press"  Purchased for $34.99. For an enlargement of this image, see Exhibit E 13. | "SH&SH Stainless Steel French Coffee Press"  Purchased for $32.26,  For an enlargement of this image, see Exhibit E 14. | "STANSPORT 3 Cup French Coffee Press"  Purchased for $13,28. For an enlargement of this image, see Exhibit E 15. |
|  |  |  |
| "LINKYO French Press Stainless Steel Coffee Maker"  Purchased for $32.56. For an enlargement of this image, see Exhibit E 16. | "OHMY Café Style Coffee & Tea Press 34 oz.  White Blanco"  Purchased for $23.82.  For an enlargement of this image, see Exhibit E 17. | "KONA FRENCH PRESS 34 fl.oz/1000ml".  Purchased for $42.37.  For an enlargement of this image, see Exhibit E 18. |

39. The majority of the products depicted above contain both functional and non-functional elements. The functional elements are:

    39.1. a cylindrical internal form; and

    39.2. a circular perforated plunger attached at the lower end of a rod that conforms to the diameter of the interior cylinder wall.

40. The non-functional elements are:

    40.1. differently shaped enclosing structures around the internal cylindrical form;

    40.2. differently shaped handles;

    40.3. differently shaped caps or lids; and

    40.4. differently shaped knobs and/or handles on the lids.

41. The evidence presented above is overwhelming, that the design of coffee presses with plungers is arbitrary and not the result of de jure functionality, since there are such a wide variety of designs that have been developed for the marketplace and that the features are "merely an ornamental, incidental, or arbitrary aspect of the device."[8]. In spite of the fact that the majority of the designs presented in the table above all contain a cylindrical internal shape containing a plunge rod connected to a disk with perforations, the overall appearance is not dictated by the functionality of those elements, but is expressed by the combination of the other, non-functional elements. This is analogous to the majority of automobiles that all have four round (functional wheels) windshields, seats, doors engines, etc., yet it is the overall non-functional appearance of each branded car which the general public becomes familiar with and identifies with. Accordingly, my examination of the designs of similar products leads me to opine that the essence of the overall design configuration of the "The original French Press Bodum" product embodying the CHAMBORD trade dress is arbitrary, is inherently distinctive and not based on functional features, and is thus entitled to trade dress protection.

42. Additionally, I note that the accused brand, "Sterling Pro" has differently designed coffee presses, as depicted in Exhibits E-7 and E-8 in the table above

---

[8] Lanham Trade-Mark Act, § 1 et seq., U.S.C.A. § 1051 et seq.

that have substantially different external appearances than either the Bodum CHAMBORD product or either of the two accused A Top products.

## VII.   MY DESIGN ANALYSIS OF THE BODUM ORIGINAL FRENCH PRESS

43.    Below is a perspective view of the Bodum Original French Press, and my analysis of the design.



44.    I have opined that the functional features of the Bodum Original French Press are:

44.1.   a cylindrical internal form; and

44.2.   a circular perforated plunger that conforms to the diameter of the interior cylinder wall and is attached at the lower end of a rod.

45.    It is my opinion that the non-functional features of the Bodum Original French Press that are merely ornamental, incidental or arbitrary are:

45.1.   The dominant design element is a horizontal narrow circumferential polished metal band that is linked to narrow vertical bands equally spaced around the circumference of the transparent cylindrical form, and which extends below and outwardly to form the products feet.

45.2.   The sub dominant design element is a black handle that follows the form of a letter "C" when viewed from the left side of the product or a letter "D" when viewed from the right side, and is attached with a fastener at the

upper portion to a circumferential metal band that is spaced below the top of the transparent cylindrical form.

45.3.  The subordinate design element is the polished domed top.

45.4.  Another subordinate design element is the spherical handle centered on the domed top.

46.  Accordingly, no rational person would conclude that the ornamental design elements that I have described above could be found to have de jure functionality since the prior art I have cited clearly demonstrates the numerous alternative designs known in the marketplace.

## VIII.  MY VISUAL COMPARISON OF THE BODUM PRODUCT WITH THE ACCUSED A TOP PRODUCTS

47.  I understand that "The original French Press Bodum" product has been in the marketplace in the United States since 1983 until the present.  During this period, "The original French Press Bodum" has established its CHAMBORD trade dress as identifying Bodum as its source.

48.  In the table below, I compare the design of "The original French Press Bodum" product with the accused A Top product having four support feet.  I understand that A Top no longer depicts this iteration of it's copy of the Bodum CHAMBORD coffee press on the Amazon web site.

# TABLE 3

**VISUAL COMPARISON OF "THE ORIGINAL FRENCH PRESS BODUM"**

**AND THE ACCUSED A TOP PRODUCT WITH FOUR SUPPORT FEET**

| "The Original French Press Bodum" | The Accused A Top Product | My Comments |
|---|---|---|
|  |  | **Perspective View**. The overall appearance of the accused A Top product is so substantially similar to "The Original French Press Bodum" product that an ordinary observer would be confused as to the products source. For an enlargement of this image, see Exhibit F 1. |
|  |  | **Front View**. The overall appearance of the accused A Top product is so substantially similar to "The Original French Press Bodum" product that an ordinary observer would be confused as to the products source. For an enlargement of this image, see Exhibit F 2. |
|  |  | **Rear View**. The overall appearance of the accused A Top product is so substantially similar to "The Original French Press Bodum" product that an ordinary observer would be confused as to the products source. For an enlargement of this image, see Exhibit F 3. |

| | | |
|---|---|---|
|  |  | **Right Side View**. The overall appearance of the accused A Top product is so substantially similar to "The Original French Press Bodum" product that an ordinary observer would be confused as to the products source. For an enlargement of this image, see Exhibit F 4. |
|  |  | **Left Side View**. The overall appearance of the accused A Top product is so substantially similar to "The Original French Press Bodum" product that an ordinary observer would be confused as to the products source. For an enlargement of this image, see Exhibit F 5. |
|  |  | **Top View**. The overall appearance of the accused A Top product is so substantially similar to "The Original French Press Bodum" product that an ordinary observer would be confused as to the products source. For an enlargement of this image, see Exhibit F 6. |
|  |  | **Bottom View**. The overall appearance of the accused A Top product is so substantially similar to "The Original French Press Bodum" product that an ordinary observer would be confused as to the products source. For an enlargement of this image, see Exhibit F 7. |

49.     The overall appearance of a product results from an examination of the product from all views, which together and in combination establish the essence of the overall design.

50.     I also note that the accused A Top product has copied and replicated:

50.1.  The dominant design element of a horizontal narrow circumferential polished metal band that is linked to four narrow vertical bands equally spaced around the circumference of the transparent cylindrical form, and which extends below and outwardly to form the products feet.

50.2.  The sub dominant design element of a black handle that follows the form of a letter "C" when viewed from the left side of the product or a letterform "D" when viewed from the the right side, and is attached with a fastener at the upper portion to a circumferential metal band that is spaced below the top of the transparent cylindrical form.

50.3.  The subordinate design element of the polished domed top.

50.4.  Another subordinate design element that is the spherical handle centered on the domed top.

51.  Additionally, the fact that the accused product replicates the size and proportions of the Bodum product further reinforces their substantial similarity.

52.  In the table below, I compare the design of "The original French Press Bodum" product with the accused A Top product having three support feet, which is the product currently depicted on the amazon web site.

| TABLE 4 | | |
|---|---|---|
| VISUAL COMPARISON OF "THE ORIGINAL FRENCH PRESS BODUM" AND THE ACCUSED A TOP PRODUCT WITH THREE SUPPORT FEET | | |
| "The Original French Press Bodum" | The Accused A Top Product | My Comments |
|  |  | **Perspective View**.  The overall appearance of the accused A Top product is so substantially similar to "The Original French Press Bodum" product that an ordinary observer would be confused as to the products source.  For an enlargement of this image, see Exhibit G 1. |



**Front View**.  The overall appearance of the accused A Top product is so substantially similar to "The Original French Press Bodum" product that an ordinary observer would be confused as to the products source.  For an enlargement of this image, see Exhibit G 2.

**Rear View**.  The overall appearance of the accused A Top product is so substantially similar to "The Original French Press Bodum" product that an ordinary observer would be confused as to the products source.  For an enlargement of this image, see Exhibit G 3.

**Right Side View**.  The overall appearance of the accused A Top product is so substantially similar to "The Original French Press Bodum" product that an ordinary observer would be confused as to the products source.  For an enlargement of this image, see Exhibit G 4.

**Left Side View**.  The overall appearance of the accused A Top product is so substantially similar to "The Original French Press Bodum" product that an ordinary observer would be confused as to the products source.  For an enlargement of this image, see Exhibit G 5.



| | | **Top View**. The overall appearance of the accused A Top product is so substantially similar to "The Original French Press Bodum" product that an ordinary observer would be confused as to the products source. For an enlargement of this image, see Exhibit G 6. |
| | | **Bottom View**. The overall appearance of the accused A Top product is so substantially similar to "The Original French Press Bodum" product that an ordinary observer would be confused as to the products source. For an enlargement of this image, see Exhibit G 7. |

53.     In spite of the fact that that the accused A Top product has three support feet instead of four support feet in the Bodum CHAMBORD product, it is my professional opinion that this ia an insubstantial change to the overall visual impression created in the eye of a shopping consumer, since it is the overall appearance, shape and proportionality of the product design that is recognizable and is memorable. Thus, it is my professional opinion that the shopping public would not distinguish this A Top product from the Bodum CHAMBORD Original French Press product, since they both appear to have the same combination of visual external design elements.

## IX. LIKELIHOOD OF CONFUSION THAT THE A TOP PRODUCT(S) WOULD BE CONFUSED WITH "THE ORIGINAL FRENCH PRESS BODUM" PRODUCT

54.     I understand that "Trade dress which may not be used in a manner likely to cause confusion as to the origin, sponsorship, or approval of the goods."[9]

55.     I understand the following factors are to be considered to assess the likelihood of confusion:[10]

    55.1.    the similarity of the marks;

---

[9] *Traffix Devices, Inc. v. Marketing Displays, Inc*. 532 U.S.23,AT 29
[10] *Pignons S.A. de Mecanique de Precision v. Polaroid Corp*., 657 F.2d 482, 487 (1st Cir. 1981).

55.2. the similarity of the goods;

55.3. the relationship between the parties channels of trade;

55.4. the relationship between the parties advertising;

55.5. the classes of prospective purchasers;

55.6. evidence of actual confusion;

55.7. the defendant's intent in adopting its mark;

55.8. the strength of the plaintiff's mark.

56. I will now discuss each of the aforementioned eight factors to be considered in my product confusion analysis.

   56.1. "The similarity of the marks"

      56.1.1. The accused product is substantially similar to the valid trade dress owned by Bodum.

   56.2. "The similarity of the goods"

      56.2.1. The accused product is substantially similar to the Bodum product. It is of the same general proportions and has the same overall visual appearance as the Bodum product.

   56.3. "The relationship between the parties channels of trade"

      56.3.1. It appears that both parties utilize the same channels of trade, namely the Amazon.com website.

   56.4. "The relationship between the parties advertising"

      56.4.1. Whereas I understand that Bodum does considerable advertising and promotion of its product, I am unaware of the advertising for the accused product, other than its' listing on Amazon.com and it's use of certain amazon promotional programs.

   56.5. "The classes of prospective purchasers"

      56.5.1. I understand that the prospective purchasers of both the "The Original French Press Bodum" product and the accused product would be the same, i.e., individuals shopping online at Amazon.com for a "coffee press".

   56.6. "Evidence of actual confusion"

56.6.1. I am presently unaware of any documented evidence of actual confusion on the part of the purchasing public.

56.7. "The defendant's intent in adopting its mark"

56.7.1. The defendant has copied the Bodum product in an attempt to deceive the public into thinking that the overall appearance of the product is owned by the defendant.

56.8. "The strength of the plaintiff's mark"

56.8.1. The Bodum mark is very strong and has been in the United States marketplace for many years and on this specific product since 1983. The design of the "The Original French Press Bodum" product has become iconic, and is well known.

## X.  CONCLUSIONS

57.  My examination of the designs of similar products leads me to opine that the essence of the overall design configuration of the "The original French Press Bodum" product is arbitrary, is inherently distinctive and not based on functional features, and is thus entitled to trade dress protection.

58.  I found the overall appearance of accused A Top product with four support feet to be substantially similar to "The Original French Press Bodum" product so that an ordinary observer would be confused as to the products source.

59.  I found the overall appearance of accused A Top product with three support feet to be so substantially similar to "The Original French Press Bodum" product that an ordinary observer would be confused as to the products source.

60.  It is clear to me that A Top has chosen to combine all of the design elements in an identical external design to that of the Bodum original French Press, and they did this in spite of the fact that they also placed into the marketplace other products that performed the same function but had different external design elements as depicted in Exhibits E-7 and E-8.

61.  In summary then it is my expert opinion that there is a significant opportunity for a likelihood of confusion that either of the two accused A Top products would be confused with the "The Original French Press Bodum" product in the marketplace, since both accused products have the same combination and

proportionality of design elements that consititute the overall appearance of a product.

62.     It is also my expert opinion that the two accused A Top products infringe the trade dress of the "The Original French Press Bodum" product, since both accused products have slavishly copied the same combination and proportionality of design elements that consititute the overall exterior appearance of a product.

63.     Additionally, because A Top also markets French coffee presses as depicted in Exhibits E 7 and E 8, that perform the same function as the Bodum Original French Press but have dramatically different external designs, it is apparent to me that the design of the two accused A Top products was copied directly from the Bodum Original French Press, and that any differences are minor and insubstantial.

## XI.     REMARKS

64.     I currently hold the opinions expressed in this Expert Report, which are based on all of the information made available to me as of this date.  As my study of the case continues, I may acquire additional information from such sources as deposition transcripts, deposition exhibits, and trial testimony.  In addition I may attain supplemental insights that that result in added observations.  I reserve the right to supplement this Expert Report and to rely on additional documents and testimony that come to my attention between now and the time of the trial.  For example, I may supplement this Expert Report to take into account the fact that the parties may produce documents relevant to my analyses, and that additional testimony from the Plaintiff, Defendant and third parties may become available.  Nevertheless, I believe that the information before me to date supports the opinions expressed in this document.  I also reserve the right to rely on all other declarations and expert reports submitted in this litigation.

65.     Furthermore, I may also be called upon to provide expert analysis and opinions in rebuttal to any proofs brought forward by the Defendant in this litigation.  To the extent additional information is provided, I intend to address it and, if appropriate, submit a rebuttal report.

66. During my testimony at trial, hearing or deposition, I expect to rely upon exhibits prepared to depict and explain the information contained in this Expert Report or as rebuttal to testimony by the Defendant's witnesses. Any such exhibits will be prepared and identified at the appropriate time.

67. I HEREBY DECLARE under penalty of perjury that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine and imprisonment, or both, under 18 U.S.C. §1001.


Respectfully submitted,

Dated: February ___8___, 2017

_____
Robert John Anders

A          Curriculum Vitae

B          Publications and Papers Presented to Professional Societies, Organizations and Companies

C          Cases in which Robert John Anders has been deposed or testified as an Expert Witness during the last four years

D          Pages from the Amazon.com website depicting the accused and asserted products

E          Competitive Coffee Pots with Plungers

F          Enlargements of Visual Comparison of "The Original French Press Bodum" and the Accused A Top Product with Four Support Feet

G          Enlargements of Visual Comparison of "The Original French Press Bodum" and the Accused A Top Product with Three Support Feet

| Curriculum Vitae: | Robert John Anders<br>78 Continental Road<br>PO Box 609<br>Warwick, N. Y. 10990-0609 | Voice:  845-987-8674<br>Fax:  845-987-8675<br>Cell:  845-987-6534<br>email:  rjanders@msn.com |
|---|---|---|

| **EMPLOYMENT:** | **Robert Anders, A Design Consultancy**<br>P. O. Box 609<br>Warwick, N.Y., 10990-0609 | Owner of consultancy involved with industrial design. |
|---|---|---|
| **Professor** | **Pratt Institute**<br>Department of Industrial Design<br>Brooklyn, N.Y. | Taught undergraduate and graduate courses, Created new graduate programs: "Design Management" and "Arts & Cultural Management" |
| **Acting Associate Dean** | School of Art & Design<br>Pratt Institute | Responsible for financial and administrative management systems. |
| **Deputy Commissioner General** | **U.S. Exhibition, Expo '88**<br>Brisbane, Australia<br>U.S.I.A., Washington, D.C., | Responsible for project direction and overall management of the $8.5mm exhibition |
| **Chief, Exhibitions Management Division** | **Pennsylvania Historical & Museum**<br>Commission, P. O. Box 1026<br>Harrisburg, PA., 17108-1026 | Responsible for the design fabrication and maintenance of exhibits at all 27 museums and historical sites in Pennsylvania. |
| **Vice President**<br><br>**President,** | **Barry Howard & Associates, Inc.**<br>Larchmont, N.Y.<br>**Interpretive Media, Ltd.**<br>New Orleans, LA. | Principal responsible for project design and management at the parent firm and for the Creative direction and management of this audiovisual subsidiary. |
| **Vice President** | **PHP International, Inc**.<br>Harrison N.Y. | Principal responsible for exhibit and graphic design; field supervision. |
| **Director, Visual Merchandising** | **Revlon, Inc.**<br>767 Fifth Avenue<br>New York, N.Y., 10022 | Department head responsible for design and management of all displays at consumer point of purchase. |
| **President** | **The Anders Group, Inc.**<br>Staten Island, N.Y. | Owner of a firm involved with the general practice of industrial design. |
| **Director, Staff Design** | **Bristol-Myers Company**<br>345 Park Avenue<br>New York, N.Y., 10022 | Established and managed a department of seventeen which provided a wide variety of industrial design services to the corporate staff and divisions. |

| | | |
|---|---|---|
| **President** | **Robert Anders Design, Inc.**<br>342 Madison Avenue<br>New York, N.Y., 10017 | Owner of an industrial design firm<br>with a staff of 22 concerned with<br>exhibition, graphic, audio-visual,<br>museum, interior, product and<br>furniture design. |
| **Assistant Director** | Exhibition Design Department<br>Donald Deskey Associates, Inc.<br>New York, N.Y. | Responsible for creative super-<br>vision and project administration<br>of up to thirty-eight designers<br>creating major exhibitions. |
| **Director of Industrial Design** | Arthur Wagner Associates, Inc.<br>New York, N.Y. | Supervised all industrial design<br>and architectural projects for<br>this thirteen person office. |
| **Exhibition & Architectural Design Specialist** | Office of International Trade Fairs<br>U.S. Department of Commerce<br>Washington, D.C. | Project designer of U.S.<br>Exhibitions at international trade<br>fairs abroad. |

**EDUCATION:**           B.I.D. (Bachelor of Industrial Design)        U.S. Naval Schools:
                         Department of Industrial Design              Aerial Photography, Pensacola, FL
                         Pratt Institute, Brooklyn, N.Y.              Deep Sea Divers, San Diego, CA

**AWARDS & HONORS:**
                         First prize in package design, National Paper Box Association
                         Pratt Institute Alumni; " Contemporary Achievement Award"
                         "Dean's Medal", Department of Industrial Design, Pratt Institute

**SOCIETIES:**           **IDSA** (Industrial Designers Society of America)
                         **HF&ES** (Human Factors and Ergonomics Society)

Publications and Papers Presented to Professional Societies, Organizations and Companies

*Design Patent Drawing Conventions:  Break Lines That May Be Fatal.*  Article published online at Experts.com website.  February, 2015.

*CAUTION! CAD drawings may be fatal to your design patent.*  Article published online at TASAnet.com.  Summer, 2010.

*At what point in time should an industrial design expert be retained in a lawsuit?*  Article published online at Experts.com website.  Winter, 2009 Withdrawn February 2015.

*Defining, Mapping and Designing the Design Process.* Article published in the Design Management Journal, Volume 11, Number 3, Summer 2000.

*Design In Today's Corporate Culture.* Guest Editor and author of article in Innovation, the quarterly journal of the Industrial Designers Society of America, Spring, 1999.

*The Design Management Program (DMP) at Pratt Institute.* Article published in Design Management Journal, Vol. 9, Number 2, Spring 1998.

*Universal Design in the Industrial Design Department at Pratt Institute.* Article published in Innovation, the quarterly journal of the Industrial Designers Society of America, Spring, 1997.

*Design Management… for Designers? An outrageous idea whose time has come.* Article prepared for Innovation, the quarterly journal of the Industrial Designers Society of America, Fall, 1996.

*Fostering Strategic New Design Cultures.* Paper presented at the 8th International Forum on Design Management Research & Education, at IESE Universidad De Navarra, Barcelona, Spain. November 20-22, 1996.

*Universal Design for Hand Held Products.* Paper Presented to Universal Design Education Project, Boston, Massachusetts. 1994.

*Universal Design.* Keynote Speech, Universal Design Education Project, Miami University, Miami, Ohio. 1994.

*Universal Design.* Talk prepared for the Display, Design & Fixture Design Show. Chicago Hilton & Towers, May 26, 1994. (Also Published by Adaptive Environments on the Internet, 1995.)

*Universal Design.* Graduate Course at the University of Industrial Arts, Helsinki, Finland. 1993.

*Universal Design, Pratt Institute Design Primers*. Book, co-author with Daniel M. Fechtner, M.D., under a grant received from the J.M. Foundation. Published by Pratt Institute Department of Industrial Design & Pratt Center for Advanced Design Research. 1993. Sold nationally by the IDSA.

*Universal Design Curriculum*. Book, co-author, with Daniel M. Fechtner, M.D., Grant received from the J.M. Foundation. Published by Pratt Center for Advanced Design Research. 1992. Sold nationally by the IDSA.

*Expo '92.* Seminar for faculty and students, Department of Industrial Design, University of Essen; Essen, Germany. 1992.

*Universal Design from an Industrial Design Perspective*. Paper presented at Colloquium for the Universal Design Education Project, North Carolina State University. 1992.

*Universal Design Curriculum Development* Co-author, with Daniel M. Fechtner, M.D., Paper presented at the IDSA Annual Meeting, Educators Conference. 1992

*Making Sense of a Spectrum of Users From Two Divergent Disciplines*. Co-author, with Daniel M. Fechtner, M.D., Paper presented at the IDSA Annual Meeting, Educators Conference. 1992

*Universal Design Career Day for High School Students.* (at the Cooper Hewitt National Museum of Design). Co-author, with Daniel M. Fechtner, M.D., Paper presented at the IDSA Annual Meeting, Educators Conference. 1992.

*Is It Fair* Metropolis, magazine, November, 1992, p.57.

*CATIA® (Computer Aided Three-dimensional Interactive Application)* User Manual for Industrial Designers. Co-author, with Clarence Feng and Alexander W.S. Tam. Written under research agreement No. 8093 with IBM. Published by Pratt Institute, Brooklyn, New York. 1990

*Cases in which Robert John Anders has been deposed or testified as an Expert Witness during the last four years*

| Case | Court | Type of Testimony |
|---|---|---|
| Louis M. Kohus v. [Graco Children's Products, Inc. et al.] | United States District Court Southern District of Ohio Western Division Civil Action No. 1:09-CV-503 | Deposition 03/19/13 |
| [Mary Elizabeth Jordan-Flickinger] v. Trade Fixtures et al. | United States District Court Eastern District of New York NO. 1:12-CV-00713 | Deposition 04/11/13 Trial 06/18 & 19/13 |
| Carson Optical, Inc. et al. v. [Prym Consumer USA, Inc. et al.] | United States District Court Eastern District of New York Civil Action No.: 11-cv-03677 | Deposition 07/12/13 |
| Virco Mfg. Corporation v. [Hertz Furniture Systems LLC and Academia Furniture LLC] | United States District Court Central District of California CV 13-02205 GHK (JCx) | Deposition 01/30/14 |
| Blumenthal Distributing, Inc. v. [Herman Miller Inc.] | United States District Court Central District of California 5:14-cv-01926-JAK-SPx | Deposition 12/02/15 Trial 9/30/16 |



Home & Kitchen ˅   sterling pro coffee press

Departments ˅       Browsing History ˅   Today's Deals   Gift Cards & Registry       Hello, Angela
                                                                            Account & Lists ˅   Orders   Prime ˅       0  Cart

Home & Kitchen   Best Sellers   Shop by Room ˅   Bedding & Bath ˅   Home Décor ˅   Artwork ˅   Storage ˅   Vacuums & Floor Care ˅   Heating & Cooling ˅

‹ Back to search results for "sterling pro coffee press"

SterlingPro

### SterlingPro French Coffee Press 8 Cup (1 liter, 34 oz), Chrome

4,999 customer reviews

| 208 answered questions

#1 Best Seller in Coffee Presses

List Price: ~~$68.00~~
Sale: **$27.98**
You Save: $40.02 (59%)

**In Stock.**

**Want it tomorrow, Jan. 27?** Order within **45 mins** and choose **One-Day Shipping** at checkout. Details
Sold by SterlingPro and Fulfilled by Amazon. Gift-wrap available.

Package Quantity: **1**

Size: **16cm x 14cm x 24cm**

- Makes the best tasting coffee-brews 1 liter, 34oz. total carafe is made of durable and heat-resistant borosilicate glass
- Far more superior than other French presses in removing "all" grounds from your coffee giving you an amazingly smooth cup of coffee
- Perfect gift for all coffee and tea lovers
- Two extra replacement screens included with this SterlingPro French press

Used & new (35) from $21.68

Report incorrect product information.

**Recipes & Inspiration**
from Andie Mitchell
› Learn more

Click to open expanded view

Share       2K+ Shares

Qty:  1  ▾

[ Add to Cart ]

Turn on 1-Click ordering for this browser

Ship to:
Angela Abrams- Warwick - 10990

[ Add to List ]

[ Add to Wedding Registry ]

Add to your Dash Buttons

**Other Sellers on Amazon**

**$40.96**      [ Add to Cart ]
+ Free Shipping
Sold by: e-choices

Used & new (35) from $21.68

Have one to sell?   [ Sell on Amazon ]

**100% Arabica Low Acidity Gourmet Ground Coffee**

Café Don Pedro American Roast, 34.5 Ounce
240
**$16.95**

Ad feedback

### Frequently Bought Together

Total price: **$66.74**

[ Add all three to Cart ]

[ Add all three to List ]

These items are shipped from and sold by different sellers. Show details

☑ **This item:** SterlingPro French Coffee Press 8 Cup (1 liter, 34 oz), Chrome $27.98
☑ KRUPS F203 Electric Spice and Coffee Grinder with Stainless Steel Blades, 3-Ounce, Black $19.99
☑ Friis 16-Ounce Coffee Vault, Stainless Steel $18.77

### Sponsored Products Related To This Item (What's this?)



Home & Kitchen     bodum coffee press

Departments ▾     Browsing History ▾     Today's Deals     Gift Cards & Registry     Hello, Angela     Account & Lists ▾     Orders     Prime ▾     0 Cart

Home & Kitchen     Best Sellers     Shop by Room ▾     Bedding & Bath ▾     Home Décor ▾     Artwork ▾     Storage ▾     Vacuums & Floor Care ▾     Heating & Cooling ▾

‹ Back to search results for "bodum coffee press"

Share

French Press Espresso Cup,

omer reviews

Order within **9 hrs 28 mins** and checkout. Details
n.com. Gift-wrap available.

Roll over image to zoom in

JAVA     CAFFETTIERA     CHAMBORD

**Buy new:**     $39.19

Qty: 1 ▾

Add to Cart

Turn on 1-Click ordering for this brow ser

Ship to:
Angela Abrams- Warwick - 10990

**Buy used:**     $32.01

Add to List

Add to Wedding Registry

Add to your Dash Buttons

**Other Sellers on Amazon**

$39.19     Add to Cart
Sold by: Glamzon Express

$42.87     Add to Cart
+ Free Shipping
Sold by: Gatzies

$43.00     Add to Cart
+ Free Shipping
Sold by: ButterflyPhoto

Used & new (30) from $30.37

Have one to sell?     Sell on Amazon

- Coffee is measured in 4 oz. cups, this 12-cup, 51-ounce French Press serves for 3-4 people
- Carafe is made of durable, heat-resistant borosilicate glass; Stainless Steel frame and heat resistant handle. Both Dishwasher Safe
- 3-part stainless steel mesh filter helps extract your coffee's aromatic oils and subtle flavors
- Pressed coffee extracts the perfect amount of essentials oils and acids from the bean for the maximum amount of flavor from your coffee. It's the preferred method for brewing for coffee enthusiasts everywhere
- All parts are dishwasher-safe

Used & new (30) from $30.37

Report incorrect product information.

Also Available in Frustration-Free Packaging
This product is now available in easy-to-ship, easy-to-open packaging optimized for our customers. See the Amazon Certified Frustration-Free Packaging version.

Apace Living
Pour Over Coffee Maker on Introductory Sale

Apace Living Pour Over Coffee Maker (800 ml / 27 oz) and Coffee Scoop - Pe...
23
$24.99

**Frequently Bought Together**

Total price: **$59.18**







































**"The Original French Press Bodum"**　　　　　**The Accused A Top Product**

 

**"The Original French Press Bodum"**          **The Accused A Top Product**



**"The Original French Press Bodum"**          **The Accused A Top Product**



**"The Original French Press Bodum"**          **The Accused ATop Product**



**"The Original French Press Bodum"**        **The Accused A Top Product**



**"The Original French Press Bodum"**



**The Accused A Top Product**



**"The Original French Press Bodum"**



**The Accused A Top Product**



**"The Original French Press Bodum"**       The Accused A Top Product

 

**"The Original French Press Bodum"**        The Accused A Top Product





**"The Original French Press Bodum"**          **The Accused A Top Product**



**"The Original French Press Bodum"**          **The Accused ATop Product**



**"The Original French Press Bodum"**          **The Accused A Top Product**



**"The Original French Press Bodum"**



**The Accused A Top Product**



**"The Original French Press Bodum"**



**The Accused A Top Product**