IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

BODUM USA, INC.,

        Plaintiff,

v.

A TOP NEW CASTING INC.,

        Defendant.

No. 1:16-cv-02916

Honorable Matthew F. Kennelly

JURY TRIAL DEMANDED

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S
MOTION TO EXCLUDE THE EXPERT TESTIMONY AND EVIDENCE OF
RHONDA HARPER REGARDING LIKELIHOOD OF CONFUSION, FOR
SUMMARY JUDGMENT OF NO LIKELIHOOD OF CONFUSION,
AND FOR SUMMARY JUDGMENT OF NO SECONDARY MEANING**

Plaintiff, Bodum USA, Inc. ("Bodum"), by and through its undersigned attorneys, submits the following Response in Opposition to Defendant A Top New Casting Inc.'s ("A Top") Motion to Exclude the Expert Testimony and Evidence of Rhonda Harper Regarding Likelihood of Confusion, for Summary Judgment of No Likelihood of Confusion, and for Summary Judgment of No Secondary Meaning (the "Motion").

## I. INTRODUCTION

In asking the Court to grant its now third motion for summary judgment, A Top generally ignores the relevant factors applicable to the analysis of a likelihood of confusion and secondary meaning, as well as Bodum's significant evidence in support of both issues. Instead of applying legal authority from the Seventh Circuit, A Top essentially argues that the Court should exclude the expert testimony of Rhonda Harper because A Top's retained expert, Mark Keegan, disagrees with various aspects of a survey designed by Ms. Harper. Because A Top's arguments

are incorrect both with respect to the applicable legal principles and the evidence that Bodum can present in this case, the Court should reject A Top's motion in its entirety.

Bodum's evidence in this case, much of which is ignored by A Top, clearly demonstrates a likelihood of confusion. First, Rhonda Harper designed a consumer research survey (the "Harper Study") analyzing the likelihood of confusion by consumers as to the source of A Top's SterlingPro French Press coffeemaker being the same as Bodum's CHAMBORD$^{®}$ French Press coffeemaker. Ms. Harper's Expert Report dated February 7, 2017 (the "Harper Report") found statistically significant results that showed a likelihood of confusion of 39.15% based on the overall design of the unbranded products. Based on these results, Ms. Harper opined that a strong likelihood of confusion exists among consumers.

A Top does not dispute Ms. Harper's specialized knowledge and qualifications as an expert in consumer research surveys. In addition, the Harper Study was conducted in accordance with generally accepted standards for surveys, including the criteria for trustworthiness detailed in the *Manual for Complex Litigation*. Further, the survey was designed to reflect the real-world online distribution of French Press coffeemakers, where the SterlingPro and CHAMBORD$^{®}$ French Press coffeemakers are sold. Because the Harper Study was designed to focus on the likelihood of confusion based on trade dress, it properly eliminated confounding variables (such as price and brand name) from the product display that would otherwise cause bias.

In its Motion, A Top first criticizes the universe from which survey respondents in the Harper Study were selected, despite the fact that the universe focused on potential purchasers of French Press coffeemakers and therefore was clearly appropriate. Moreover, the Harper Study was a double blind survey that used one of two generally accepted methods of performing a likelihood of confusion survey.

In addition, A Top argues that the Harper Study was unreliable because it left the product line-up (consisting of a SterlingPro French coffeemaker, a Bodum CHAMBORD® French Press coffeemakers and three French Press coffeemakers of other competitors embodying certain of the CHAMBORD® trade dress elements) in view of the respondents while they answered the survey questions. Yet, this line-up of products is exactly how French Press coffeemakers are purchased by consumers on Amazon.com, the online marketplace where A Top's product is sold. In addition, because the Harper Study used three other competitive French Press coffeemakers that embodied at least some, but not all, of the elements of the CHAMBORD® trade dress, it properly eliminated any potential "noise" in the survey that would have otherwise resulted from using a typical (and less effective) control.

Further, A Top ignores the multiple other factors that courts consider in determining a likelihood of confusion, which, in this case, strongly favor a finding of a likelihood of confusion. A Top ignores the testimony given that consumers that own the SterlingPro believe they have a Bodum when they do not. These products are the same. The overall design of the products is virtually identical. Moreover, the area and manner of concurrent use is very similar, as both products are sold nationwide on Amazon.com. Further, because French Press coffeemakers are low-priced household goods, consumers generally do not exercise a great degree of care in making their purchases. Given these factors, the evidence of a likelihood of confusion overwhelmingly weighs in Bodum's favor.

Finally, without much explanation or argument, A Top asserts that Bodum cannot prove secondary meaning because it did not conduct a consumer survey on the issue of secondary meaning. Yet, as one recent case in the Seventh Circuit expressly recognized, A Top's argument

3

relies on a "nonexistent rule" because a plaintiff need not rely on a consumer survey to prove secondary meaning. Further, A Top again ignores the relevant factors, which Bodum's evidence demonstrates clearly weigh in favor of a finding of secondary meaning. Bodum has sold its CHAMBORD® French Press coffeemakers in the United States for more than thirty years, generating tens of millions of dollars (and millions of units) in aggregate sales over the past decade. In addition, Bodum has extensively advertised its CHAMBORD® French Press coffeemakers for many years in the United States by expending millions of dollars in advertising costs and using multiple advertising formats, including but not limited to catalogs, television, radio, online, advertisements in trade and general circulation magazines and newspapers, point-of-purchase advertising Bodum places with its distributors, the use of Bodum's sales force and trade shows. The CHAMBORD® design has also received significant unsolicited recognition and praise, and has been included in hundreds of marketplace materials, such as newspapers and magazines, the holiday display at Crate and Barrel's flagship store, Starbucks preferred method of coffee at home, and even *Barbie's* mobile home toy. Further, on the numerous occasions when others in the industry have attempted to copy Bodum's CHAMBORD® Trade Dress, Bodum has always taken proper legal action to protect its trade dress rights, including by instituting 14 lawsuits to enforce its protectable trade dress. And, A Top has produced evidence that it has intentionally copied Bodum in the past—evidence that could lead the jury to conclude that A Top has done so again.

Given the substantial evidence that Bodum can present on the issues of likelihood of confusion and secondary meaning, A Top's motion should be denied in its entirety.

## II.      STATEMENT OF FACTS

This case involves A Top's trade dress infringement of Bodum's iconic CHAMBORD®

Trade Dress in Bodum's French Press coffeemakers.  (Defendant A Top New Casting Inc.'s

Statement of Material Facts in Support of Its Motion ("D's SOF") ¶¶ 1, 9.)  The products at issue

are both French Press coffeemakers and are sold nationwide on Amazon.com.  (D's SOF ¶¶ 16–

17.)  Bodum is an established company in the coffee section of the housewares industry and has

sold CHAMBORD® French Press coffeemakers in the United States for more than three

decades.  (Plaintiff's Statement of Additional Facts That Require Denial of Defendant's Motion

for Summary Judgment ("P's SOAF") ¶ 20.)  From 1990 to 1997, Bodum sold several hundred

thousand CHAMBORD® French press coffeemakers which accounted for millions of dollars

sales.  (*Id.* ¶ 22.)  In addition, from January 1, 2005 to December 2016, Bodum sold millions of

units of CHAMBORD® French presses in the United States (with a small amount in Canada)

that generated tens of millions of dollars in sales.  (*Id.* ¶ 24.)

Further, Bodum has engaged in extensive and consistent advertising of its

CHAMBORD® French press coffeemakers in the United States, including through catalogs,

television, radio, online, advertisements in trade and general circulation magazines and

newspapers, point-of-purchase advertising Bodum places with its distributors, the use of

Bodum's sales force, and trade shows.  (*Id.* ¶¶ 26–33.)  From 1990 through 1997, Bodum

expended several million dollars to advertise and promote its products, including the

CHAMBORD® French Press (Bodum's second largest selling product at that time), through

television advertising, exhibition at trade shows and product demonstrations.  (*Id.* ¶ 27.)  In

addition, from 2005 to the present, Bodum spent tens of millions of dollars for marketing, promotional activities and advertising for its products. (*Id.* ¶ 28.)

When others in the industry have attempted to copy the CHAMBORD® trade dress (which has happened on numerous occasions), Bodum has taken appropriate legal action to enforce its trade dress rights, including the service of approximately 70 cease and desist letters and the institution of 14 lawsuits (including this lawsuit) to protect its trade dress. (*Id.* ¶ 35.) Of the 13 prior lawsuits, eleven ended in settlements in which the defendants agreed to stop selling the product accused of infringing on the CHAMBORD® Trade Dress. (*Id.*) It is, and always has been, Bodum's intention to take all appropriate legal action to enforce the CHAMBORD® Trade Dress. (*Id.* ¶ 38.)

Bodum's counsel engaged Ms. Harper to design a consumer research survey on the issue of likelihood of confusion. (P's SOAF ¶ 1.) Ms. Harper has extensive experience and specialized knowledge relating to consumer research surveys and is appropriately qualified to design and provide expert testimony on consumer research surveys. (*Id.*) In the Harper Study, Ms. Harper designed a survey based on one of two generally accepted formats for a likelihood of confusion survey and in accordance with generally accepted standards and procedures in the field of surveys, including the criteria for trustworthiness set forth in the *Manual for Complex Litigation*. (*Id.* ¶ 2.) The Harper Study was a double blind survey, meaning that neither the respondents nor the staff of the survey administrator were informed as to the purpose or the sponsor of the surveys. (*Id.* ¶ 4.)

In addition, the Harper Study utilized a universe of respondents who, after excluding certain individuals in order to meet general industry survey participant standards, have purchased

or would consider purchasing the type of product at issue—a French Press coffeemaker. (*Id.* ¶ 5; D's SOF ¶ 18.) The survey was further designed to use stimuli of five French Press coffeemakers, including one Bodum CHAMBORD® French Press coffeemaker and one A Top SterlingPro French Press coffeemaker, which were arranged using a "line-up" methodology reflecting the real-world online distribution of French Press coffeemakers. (D's SOF ¶ 19; P's SOAF ¶ 8.) The remaining three French Press coffeemakers displayed were competing products that embodied certain, but not all, of the elements of the CHAMBORD® trade dress. (D's SOF ¶ 20.) In accordance with the scientific method, the Harper Study eliminated confounding variables (such as price and brand name) from the product display that would otherwise contribute to bias. (P's SOAF ¶¶ 10–11.)

> Upon being shown the display of five products, the survey respondents were asked:
>
> Do you think that each of these French Press Coffeemakers is from a separate company or do you think that two or more are from the same company, or are affiliated or connected [in any way]? If you don't know, please feel free to say so.

(D's SOF ¶ 21.) The survey respondents were then provided with four potential responses: (1) each is put out by a separate company, (2) two or more are from the same company, (3) two or more are put out by companies that are affiliated or associated with each other, and (4) don't know, other, or none of the above. (*Id.* ¶ 22.) Based on the respondent's answer, he or she was provided with one of the two subsequent questions:

> Using the labels beneath each product above, which two or more French Press Coffeemakers do you believe are from the same company? Please note that the products may be in a different order from the previous question. Why do you say that? Please be as specific as possible.
>
> OR

Using the labels beneath each product, which two or more French Press Coffeemakers do you believe are put out from companies that are affiliated or associated with each other? Please note that the coffeemakers may be in a different order from the previous question. Why do you say that? Please be as specific as possible.

(*Id.* ¶ 23.)

The Harper Study delivered statistically significant results exceeding a 95% confidence level.[1] (P's SOAF ¶ 12.) Ultimately, the Harper's Study's results showed a 39.15% likelihood of confusion based on trade dress elements of the unbranded products at issue. (D's SOF ¶ 25.) Based on these results, Ms. Harper concluded that a strong likelihood of confusion among consumers exists as to the source of Bodum's CHAMBORD® French Press coffeemaker and A Top's SterlingPro French Press coffeemaker. (*Id.*)

Ms. Harper's study is not merely theoretical. The CHAMBORD® has consistently been Bodum's "figurehead" product—consumers know the CHAMBORD® as the "original" French press and associate its design with Bodum. (*Id.* ¶¶ 29-30.) SterlingPro's nearly identical appearance to the CHAMBORD® has caused consumers to believe that they have a Bodum when they do not. (*Id.* ¶ 30.)

### III.     ARGUMENT

####     A.     <u>Legal Standard on a Motion for Summary Judgment</u>

Under Federal Rule of Civil Procedure 56, a district court should grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine issue of

---

[1] "Traditionally, scientists adopt the 95% level of confidence, which means that if 100 samples of the same size were drawn, the confidence interval expected for at least 95 of the samples would be expected to include the true population value." *Reference Manual on Scientific Evidence*, FEDERAL JUDICIAL CENTER 381 (3d Ed. 2011).

material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When considering a motion for summary judgment, a district court should consider the facts in the light most favorable to the nonmoving party. *See Slep-tone Entm't Corp. v. Coyne*, 141 F. Supp. 3d 813, 824–25 (N.D. Ill. 2015). Further, in deciding a motion for summary judgment, a court "may not weigh conflicting evidence or make credibility determinations, both of which are the province of the jury." *Purepecha Enters., Inc. v. El Matador Spices & Dry Chiles*, No. 11 C 2569, 2012 WL 3686776, at *9 (N.D. Ill. Aug. 24, 2012).

### B.      Bodum's Evidence Demonstrates a Likelihood of Confusion

Trade dress infringement occurs when the similarity of the trade dress of the defendant's product to that of the plaintiff's product creates a "likelihood of confusion" to consumers as to the source of the goods. *See Badger Meter, Inc. v. Grinnell Corp.*, 13 F.3d 1145, 1151 (7th Cir. 1994). In determining whether a likelihood of confusion exists, the Seventh Circuit has held that the following factors are relevant: (i) the similarity of the trade dresses, (ii) the products to which the trade dresses are attached, (iii) the area and manner of concurrent use, (iv) the degree of care likely to be exercised by consumers, (v) the strength of the plaintiff's trade dress, (vi) actual confusion and (vii) intent on the part of the alleged infringer to pass off the infringer's goods as those of the plaintiff. *Id.* at 1152. Because likelihood of confusion is an issue of fact, a motion for summary judgment on this issue must be "approached with great caution." *Rock-A-Bye Baby, Inc. v. Dex Prods., Inc.*, 867 F. Supp. 703, 707 (N.D. Ill. 1994).

In its Motion, A Top generally ignores these factors. Instead, A Top argues that the Harper Study is inadmissible and therefore Bodum has no evidence of a likelihood of confusion. Contrary to A Top's argument, however, the Harper Study clearly satisfies the standards for the

admissibility of expert testimony based on survey evidence and is therefore admissible.  In addition, when considering all of the above-mentioned factors, Bodum's evidence in this case demonstrates a likelihood of confusion.

### i.    The Harper Study Is Admissible to Prove a Likelihood of Confusion

It is well established that surveys based on principles of professional survey research are "routinely" admitted in the Seventh Circuit to establish the likelihood of customer confusion. *Dwyer Instruments, Inc. v. Sensocon, Inc.*, 2012 WL 12281609, at *2 (N.D. Ind. Feb. 21, 2012); *see AHP v. Subsidiary Holding Co. v Stuart Hale Co.*, 1 F.3d 611, 618 (7th Cir. 1993).[2]  Such evidence is routinely admitted because "survey evidence is an acceptable substitute for evidence of actual confusion."  *Navistar Int'l Transp. Corp. v. Freightliner Corp.*, No. 96 C 6922, 1998 WL 911776, at *9 (N.D. Ill. Dec. 28, 1998).

Under Rule 702, an expert witness qualified by knowledge, skill, experience, training or education may testify if (a) the expert's specialized knowledge will assist the trier of fact to understand the evidence or determine a fact issue, (b) the testimony is based on sufficient facts or data, (c) the testimony is the product of reliable principles and methods and (d) the expert has reliably applied the principles and methods to the facts of the case.  FED. R. EVID. 702.  The Seventh Circuit has held that the reliability of expert testimony "is primarily a question of the validity of the methodology employed by an expert, not the quality of the data used in applying the methodology or the conclusions produced."  *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F. 3d 796, 806 (7th Cir. 2013).  The critical inquiry in determining the reliability of expert testimony is "whether there is a connection between the data employed and the opinion offered[] . . . ."  *Id.*  If

---

[2] At least certain other circuits also routinely admit surveys conducted in accordance with accepted principles.  *See Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1036 (9th Cir. 2010) (noting that the Ninth Circuit has long held that survey evidence should be admitted as long as it is conducted according to accepted principles and is relevant).  Tellingly, A Top fails to cite a single case in the Seventh Circuit excluding expert testimony based on survey results.

a rational connection exists, the expert's reliance on purportedly faulty data "is a matter to be explored on cross-examination; it does not go to admissibility." *Id.* at 809. To hold otherwise would improperly usurp the role of the jury as the trier of fact. *Id.* at 806.

Additionally, the Seventh Circuit has expressly stated that situations in which a survey's methodology is "so flawed as to be completely unhelpful to the trier of fact" will be "rare." *AHP*, 1 F.3d at 618. Thus, in the vast majority of cases where a survey has flaws in its methodology, "the survey results to go the proper weight of the survey and should be evaluated by the trier of fact." *Id*; *see also LG Electronics U.S.A., Inc. v. Whirlpool Corp.*, 661 F. Supp. 2d 940, 956 (N.D. Ill. 2009) ("Evaluating technical deficiencies and awarding weight to [survey] evidence is the province of the trier of fact.").

In its Motion, A Top does not dispute that Ms. Harper is appropriately qualified to design and provide expert testimony on consumer research surveys. (P's SOAF ¶ 1.) Instead, A Top argues that the Harper Study should be excluded because Ms. Harper used (1) an improper design, (2) an improper universe and sampling method and (3) an unreliable methodology. A Top is incorrect on all three arguments.

1. <u>The design of the Harper Study appropriately represents the online marketplace.</u>

As an initial matter, A Top does not dispute that the Harper Study was based on one of two generally accepted formats for a likelihood of confusion survey. (*Id.* ¶ 2.) Instead, A Top asserts that the design of the Harper Study was improper because the survey design should have resembled the appearance of Amazon.com, the marketplace where both products are sold. A Top's argument makes no sense, however, as the design of the Harper Study is strikingly similar to the product display on Amazon.com. *See* MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, Vol. 6, § 32:163 at 32-412 (5th Ed. 2017). ("The closer the survey methods

mirror the situation in which the ordinary person would encounter the trademark, the greater the evidentiary weight of the survey results."). Like the Harper Study, products displayed online, including on Amazon.com, generally show the products without their respective packaging or container boxes. (*Id.* ¶ 12.) In addition, the Harper Report clearly demonstrates that the display used on Amazon.com when the term "French press coffeemaker" is searched is very similar to the display used in the Harper Study. (D's SOF ¶¶ 19, 23; P's SOAF ¶ 8.)

For example, in the Harper Study, respondents were shown the below display of products, the order of which was rotated per responder to protect against bias:



(D's SOF ¶ 19.) Notably, when the "Compare to similar items" feature of Amazon.com is viewed after clicking on the webpage for a Bodum CHAMBORD® French Press coffeemaker, a display nearly identical to the display used in the Harper Study results:



(P's SOAF ¶ 14.)

12

In addition, a court in the Seventh Circuit has specifically addressed a likelihood of confusion survey using this methodology and held it to be admissible. *See Dwyer*, 2012 WL 12281609, at *3–*6. In *Dwyer*, the expert conducted an internet survey that showed the respondents five products, including the plaintiff's product, the defendant's product and products of three competitors. *Id.* at *3. Similar to the Harper Study, the survey in *Dwyer* then asked the respondents several questions relating to whether any of the products shown were put out by the same company or companies associated with each other. *Id.* at *3. Despite the defendant's attacks on the survey's methodology, the court held that the survey met the standards of Rule 702 and was admissible. *Id.* at *3–*6.

Further, the Court should reject A Top's argument that the Harper Study should have included product descriptions, brand names and pricing information. Because the Harper Study was designed to measure the likelihood of confusion based on trade dress (i.e., the overall design of the product), not brand name, the inclusion of these other variables would have been confounding and would have contributed to noise and bias.[3] (P's SOAF ¶ 11.) The scientific method requires that an appropriate study either eliminate these variables or control them. (*Id.*) The Harper Study properly eliminated these confounding variables. (*Id.*)

In addition, A Top argues that the Harper Study should have included an instruction for the respondent to "imagine you are shopping for" a French Press coffeemaker. As Ms. Harper testified in her deposition, however, such an instruction was not included in the Harper Study in order to minimize potential bias. (*Id.* ¶ 15.) For example, survey respondents could have easily interpreted this instruction to require them to imagine shopping to purchase a French Press

---

[3] The fact that brand names are included on Amazon.com is of no moment because even in a traditional retail setting, consumers, if they so choose, can use brand and pricing information to inform their purchase. In addition, while A Top claims that the phrase "#1 Best Seller" is listed in the SterlingPro's Amazon.com listing, no such phrase is currently present.

coffeemaker for themselves, when in fact many potential purchasers of French Press coffeemakers could be purchasing the product as a gift for a friend or a relative.

2.   The Harper Study used an appropriate universe and sampling method.

In addition, A Top argues that the Harper Study used an improper universe of respondents who "have purchased, or would consider purchasing, a French Press coffeemaker" of any kind because such a universe does not focus on potential purchasers of the SterlingPro product. Again, A Top is wrong.

The legal inquiry into whether the defendant's product has infringed upon the trade dress of the plaintiff's product centers on the confusion of customers "in the market for the particular products at issue." *Dwyer*, 2012 WL 12281609, at *4; *see also Reference Manual on Scientific Evidence*, FEDERAL JUDICIAL CENTER 376 (3d Ed. 2011) ("[I]n trademark litigation, the relevant population in some disputes may include all prospective and past purchasers of the plaintiff's goods or services and all prospective and past purchasers of the defendant's goods or services."). In this case, the universe in the Harper Study was proper because it met general industry survey participant standards and was consistent with protocols used in conducting trade dress surveys. (P's SOAF ¶ 5; D's SOF ¶ 18.) In particular, the Harper Study's universe was proper because it limited the universe to those who have purchased or would consider purchasing the type of product at issue—a French Press coffeemaker.[4] (D's SOF ¶ 18.) Further, the universe used by the Harper Study is not improper for failing to exclude individuals who do not shop online because virtually everyone shops online in the modern day. (P's SOAF ¶ 6.) Moreover, given that the Harper Study was hosted and administered by a third party web-based survey solution provider, the pool from which respondents were chosen obviously included only individuals who

---

[4] The Harper Study also properly excluded certain individuals in order to ensure that the universe met general industry survey participant standards. (P's SOAF ¶ 5.)

use the Internet.  (*Id.* ¶ 3.)  If A Top wants to argue to the jury that a large portion of the population does not shop online, it is free to do so, but this purported criticism lacks merit and should not justify excluding the Harper Study.

In addition, the Harper Study's universe is not improper simply because it excluded people who have never heard of a French Press coffeemaker.  In accordance with generally accepted industry standards, the Harper Study properly asked whether a respondent would consider purchasing a French Press coffeemaker.  (P's SOAF ¶ 2; D's SOF ¶ 18.)  It is highly unlikely, and A Top cites no evidence whatsoever for its speculative assertion, that individuals who have never heard of French Press coffeemaker might simply wake up one morning and decide to purchase this product.  In addition, as Ms. Harper testified, it is necessary and appropriate to eliminate from the universe of survey respondents individuals who know too little about the product category in order to reduce bias.  (P's SOAF ¶ 7.)  Ms. Harper's testimony and reasoning is in line with industry standards because "consumers who are prospective purchasers may know more about the product category than consumers who are not considering making a purchase."  *Reference Manual on Scientific Evidence*, FEDERAL JUDICIAL CENTER 377 (3d Ed. 2011).  Thus, for these reasons, the Harper Study clearly used the proper universe of survey respondents.[5]

In addition, A Top incorrectly argues that the Harper Study is inadmissible because it failed to use "masking" items and instead asked as a screening question whether participants had purchased or would consider purchasing a French Press coffeemaker.  Ms. Harper testified, however, that "masking" was not necessary or appropriate in this survey.  (P's SOAF ¶ 16.)  It is

---

[5] In any event, courts in the Seventh Circuit have generally held that deficiencies in the universe used in survey evidence go to the weight of the evidence, not its admissibility.  *Dwyer*, 2012 WL 12281609, at *4; *see also Piper Aircraft Corp. v. Wag-Aero, Inc.*, 741 F.2d 925, 930–31 (7th Cir. 1984) (holding that the survey universe employed was sufficiently precise and that any flaws in the universe used would go "to the weight to be given the survey results, not the admissibility of the survey.").

also not commonly used in trade dress surveys. (*Id.*) As an example of an appropriate screening question, the *Reference Manual on Scientific Evidence* provides that: "if respondents must be prospective and recent purchasers of Sunshine orange juice in a trademark survey designed to assess consumer confusion with Sun Time orange juice, potential respondents might be asked to name the brands of orange juice they have purchased recently or expect to purchase in the next 6 months." *Reference Manual on Scientific Evidence*, FEDERAL JUDICIAL CENTER 387 (3d Ed. 2011). Even though a potential respondent being asked this question would clearly know that the study is about orange juice, this type of screening question is appropriate to ensure that only eligible individuals participate in the survey. *See id.* Thus, the screening question used in the Harper Study, "Have you ever purchased, or would you ever consider purchasing, a French Press coffeemaker," is in line with accepted industry standards.

Further, it cannot be credibly disputed that the Harper Study was a double blind survey because neither the respondents nor the staff of Survey Monkey (the survey's administrator) were informed as to the purpose or the sponsor of the surveys. *See Dwyer*, 2012 WL 12281609, at *2 (holding a study to be double blind and admissible where neither the survey respondents nor the entity administering the survey knew the purpose or the sponsor of the survey).

### 3. The methodology of the Harper Study is reliable

A Top also argues that the methodology of the Harper Study is unreliable because it left the stimulus in full view of the participants and thus subjected the participants to a matching game. Yet, the Harper Study's methodology of keeping the stimuli in front of the survey participants is representative of how the products are viewed on Amazon.com. (P's SOAF ¶ 13.) Notably, A Top's criticism of this portion of the Harper Study's methodology is directly undercut by its argument that a survey should seek "to replicate the marketplace experience as

closely as possible." (Pl. Memo. at 7.) Similarly, A Top's argument that the Harper Study should have removed the products from the participants' view before asking the participants questions about the products lacks common sense, given that online shoppers make purchases while viewing products. Further, it would have been unreasonable for the average consumer to memorize which of the five products, based on the random letter assigned to each product, appeared to be from the same company or affiliated companies. (P's SOAF ¶ 17.) Given that this methodology was held to be appropriate by the *Dwyer* court, this Court should find the Harper Study to be reliable and relevant. *Dwyer*, 2012 WL 12281609, at *3–*6.

Finally, A Top argues that the Harper Study is unreliable because it failed properly deduct a noise level of baseline confusion from the overall confusing finding and, after deducting such a noise level, the net level of likelihood of confusion in the marketplace based on the Harper Study's data is 9.8 percent. This step is not necessary in a study using the methodology in the Harper Study, however, because the three additional competitive products set forth in the "line-up" were selected based on the fact that they embodied certain, but not all, of the elements present in the CHAMBORD® trade dress. A deduction of a noise level of baseline confusion would only be appropriate in a study in which a typical (and less conservative) control not embodying any of the elements of the CHAMBORD® trade dress was used. Because the competitive products used in the Harper Study were selected based on the fact that they embodied at least some of the elements present in the CHAMBORD® trade dress, the noise level was already eliminated, making a deduction an unnecessary step. Moreover, the additional steps utilized by the Harper Study to reduce bias, including the rotation of the order in which the

products were displayed and the removal of confounding variables (such as price and brand name), eliminated the need to "deduct" any baseline level of confusion based on bias.

For these reasons, the Harper Study is relevant, reliable and admissible to prove a likelihood of confusion. In fact, the Harper's Study's results showed a 39.15% likelihood of confusion based on trade dress elements of the unbranded products at issue. (D's SOF ¶ 25.) Further, Ms. Harper concluded that a strong likelihood of confusion among consumers exists as to the source of Bodum's CHAMBORD® French Press coffeemaker and A Top's SterlingPro French Press coffeemaker. (*Id.*) Notably, Ms. Harper's conclusion is in accordance with findings of a likelihood of confusion by courts in the Seventh Circuit based on similar results. *See James Burrough Ltd. v. Sign of the Beefeater, Inc.*, 540 F.2d 266, 279 (7th Cir. 1976) (holding that survey results showing that 15% of respondents confused the infringing mark with the plaintiff's mark evidenced a likelihood of confusion).

###        ii.        The Remaining Factors Weigh In Favor of a Finding of a Likelihood of Confusion

In addition to the strong evidence of a likelihood of confusion set forth by the Harper Study and Ms. Harper's expert testimony, the remaining factors also favor a finding of a likelihood of confusion. First, it cannot be disputed that the overall design of A Top's product is remarkably similar to the trade dress of the Bodum CHAMBORD® French Press coffeemaker. (P's SOAF ¶ 30.).[6] Notably, more than one survey respondent in the Harper Study expressly stated in their open-ended responses that the SterlingPro French Press coffeemaker looked like a Bodum product. (P's SOAF ¶ 18.) For example, one survey respondent stated that "[t]hey look

---

[6] It is appropriate for the Court (and ultimately the jury) to compare the products' overall visual appearance side-by-side because that is how consumers purchasing the products on Amazon.com view them. Whether a comparison is made side-by-side, or in the context of viewing multiple different French Press coffeemakers as well, the overall design of these two products is virtually identical.

like Bodum French Presses.  I own two types of Bodum French Presses and they both look incredibly similar to this one[.]"  (*Id.*)  SterlingPro's nearly identical appearance to the CHAMBORD® has caused consumers to believe that they have a Bodum when they do not.  (P's SOAF ¶ 18.)

In addition, these products that both embody the CHAMBORD® Trade Dress are identical—French Press coffeemakers.  Additionally, there is no dispute that the area and manner of concurrent use of both products is very similar, particularly because both products are sold nationwide on Amazon.com.  (D's SOF ¶¶ 16–17.)  It is also undisputed that the two products directly compete against each other.  (P's SOAF ¶ 19.)  Further, because French Press coffeemakers are relatively low-priced housewares goods, consumers are not likely to exercise a high degree of care in making purchasing decisions.  (*Id.*)  Moreover, Bodum's CHAMBORD® Trade Dress is iconic and has existed for several decades.  (P's SOAF ¶¶ 20–22.)

Given that all relevant factors weigh in favor of finding a likelihood of confusion, summary judgment is not appropriate.  *See Badger Meter*, 13 F.3d at 1153 (upholding a jury verdict finding trade dress infringement even when the plaintiff failed to present any market survey evidence of likely customer confusion).  Therefore, A Top's motion should be denied.

### C.  Bodum Has More Than Sufficient Evidence to Prove Secondary Meaning

To establish secondary meaning, a plaintiff must show that, in the minds of the public, the primary significance of the trade dress is to "identify the source of the product rather than the product itself."  *Weber-Stephen Prods. LLC v. Sears Holding Corp.*, No. 13 C 01686, 2015 WL 5161347, at *4 (N.D. Ill. Sept. 1, 2015).  This industry, and consumers, have noted the design of the CHAMBORD® to be synonymous with Bodum.  (P's SOAF ¶¶ 29-30.)

In determining whether a product's trade dress has acquired secondary meaning, courts consider the following factors:  (a) direct consumer testimony or consumer surveys, (b) the exclusivity, length, and manner of use of the trade dress, (c) the amount and manner of advertising, (d) the amount of sales, (e) whether the plaintiff has an established place in the market and (f) whether there is any proof of intentional copying.  *Id.*

The sole argument raised by A Top in its Motion regarding secondary meaning is that Bodum cannot prove secondary meaning because it did not conduct a consumer survey on this issue.[7]  (Pl. Memo. at 15.)  Cases in the Seventh Circuit, however, are clear that consumer surveys are not required to prove secondary meaning.  *See Weber-Stephen Prods.*, 2015 WL 5161347, at *5 (rejecting the argument that summary judgment is appropriate when the plaintiff does not introduce a consumer survey of secondary meaning because the "argument relies on a nonexistent rule").  On this basis alone, the Court should deny A Top's motion.  In any event, while the Harper Study was not intended to examine secondary meaning, the open-ended responses in which respondent consumers recognized the overall design displayed by the Bodum and A Top products as originating from Bodum constitute clear evidence of secondary meaning. (P's SOAF ¶ 18.)

In addition, A Top wholly ignores the other relevant factors, which support a finding of secondary meaning in this case.  First, Bodum is an established company in the coffee section of the housewares industry in the United States and has utilized the CHAMBORD[®] Trade Dress on French Press coffeemakers sold in the United States since as early as 1983.  (*Id.* ¶ 20.)  In addition, Bodum is the leading seller of French press coffeemakers in the United States and has

---

[7] The Court would be more than justified in striking the portion of A Top's brief regarding secondary meaning, as A Top cites to no legal authority and offers virtually no analysis or argument other than a bald, conclusory assertion that because Bodum did not conduct a consumer survey on secondary meaning, there must be no evidence of secondary meaning.  (Pl. Memo. at 15.)

engaged in extensive marketing, promotion and advertising to sell the CHAMBORD® French Press coffeemaker.  (*Id.* ¶¶ 20–33.)  Bodum prides itself first and foremost as a design company, and the CHAMBORD® design is the icon of Bodum's design.  (*Id.* ¶ 20.)  As such, the CHAMBORD® has consistently, every year, been Bodum's "figurehead" product, as well as one of its best-selling products.  (*Id.* ¶ 29.)  The CHAMBORD® is recognized in the market as the original French press and associated with Bodum.  (*Id.*)

From 1990 to 1997, Bodum sold several hundred thousand CHAMBORD® French press coffeemakers.  (*Id.* ¶ 22.)  Bodum continued to sell CHAMBORD® French presses during the period from July 1, 1997 through December 31, 2004, during which time Bodum's sales of CHAMBORD® French presses increased to several million dollars in sales in 2005.  (*Id.* ¶ 23.)  In addition, from January 1, 2005 to December 2016, Bodum sold millions of units of CHAMBORD® French presses in the United States (with a small amount in Canada) that generated tens of millions of dollars in sales.  (*Id.* ¶ 24.)  Given that Bodum has generated tens of millions of dollars in total sales from its CHAMBORD® French Press coffeemakers in the United States over the past decade, it cannot be seriously contested that Bodum's voluminous sales of CHAMBORD® French Press coffeemakers strongly weighs in favor of a finding of secondary meaning.  *See Weber-Stephen Prods.*, 2015 WL 5161347, at *5 (relying, in part, on sales and advertising data to deny summary judgment on the issue of secondary meaning).

Further, Bodum has sold the CHAMBORD® French press to numerous major retailers including Starbucks, Peet's Coffee and other coffee specialty stores, big box stores such as

Target, Walmart and Bed Bath & Beyond, specialty housewares and cookware stores such as Crate & Barrel, Sur la Table and Williams-Sonoma, and department stores such as Macy's and Kohl's. (*Id.* ¶ 25.) Also, Bodum has a substantial relationship with Amazon, the preeminent online retailer in the United States. (*Id.*) Bodum's relationships with key retailers in the United States, including Amazon.com, through which Bodum sells numerous CHAMBORD® French Press coffeemakers, provide strong evidence that Bodum's CHAMBORD® French Press coffeemaker has an established place in the market.

In addition, Bodum has engaged in extensive and consistent advertising of its CHAMBORD® French Press coffeemakers in the United States since 1983. (*Id.* ¶ 26.) From 1990 through 1997, Bodum expended several million dollars to advertise and promote its products, including the CHAMBORD® French Press (Bodum's second largest selling product at that time), through television advertising, exhibition at trade shows and product demonstrations. (*Id.* ¶ 27.) In particular, Bodum spent hundreds of thousands of dollars on television advertising in 1994 and 1995, which was unusual for a small company in the housewares business to do at that time. (*Id.*) But, Bodum did so to increase the promotion of the CHAMBORD® French press in the United States. (*Id.*)

In addition, Bodum has continued to engage in promotional activities and make substantial expenditures for advertising the CHAMBORD® French Press coffeemaker. From 2005 to the present, Bodum spent tens of millions of dollars for marketing, promotional activities and advertising for its products. (*Id.* ¶ 28.) While Bodum promoted other of its products as part of these expenditures, the CHAMBORD® French press was prominently featured in Bodum's

advertising because it was Bodum's iconic and one of its best-selling products representing a significant percentage of Bodum's sales. (*Id.*) Bodum also incurred large depreciation expenses relating to depreciation of exhibition fixtures (relating primarily to its booth at trade shows) of millions of dollars for marketing and promotional expenses during this period. (*Id.*)

Bodum has advertised its CHAMBORD® French Press coffeemakers through numerous mediums, including catalogs, television, radio, online, advertisements in trade and general circulation magazines and newspapers, point-of-purchase advertising Bodum places with its distributors, the use of Bodum's sales force and trade shows, including the International Housewares Show in Chicago, which is the largest housewares show in the United States. (*Id.* ¶¶ 26, 32–33.) To advertise online, Bodum utilizes its own website to promote and sell to retail businesses and consumers, purchases Google AdWords, and utilizes ads on social media and/or other websites, such as Facebook, Instagram and YouTube. (*Id.* ¶ 32.) Another key area of promotion is Bodum's participation in trade shows over the past 30 years, where Bodum is an established institution. (*Id.* ¶ 33.) In fact, Bodum has one of the largest booths at the Chicago trade show every year and entertains more traffic than virtually any other supplier. (*Id.*) The CHAMBORD®, Bodum's best-seller and most recognizable design, has been featured prominently at every single one of these trade shows. (*Id.*)

Moreover, due to Bodum's massive efforts to promote its figurehead product and ensure that the CHAMBORD® is associated with Bodum in the marketplace, the CHAMBORD® French Press coffeemaker has been featured in *hundreds* of marketplace materials, such as newspapers and magazines, in its 30-year history with Bodum. (*Id.* ¶ 31.) The CHAMBORD® is often featured in picturesque settings because of its stunning design, including in everything

from front and center in the holiday display at Crate and Barrel's flagship store, to Starbucks preferred method of coffee at home, to *Barbie's* mobile home toy. (*Id.*) Further, the CHAMBORD® has been frequently reviewed, promoted and praised. (*Id.* ¶ 34.) In addition to the CHAMBORD® having received much other unsolicited recognition for its design, there are *dozens* of videos found online that promote the CHAMBORD® as the original French press coffeemaker and tout its stylish design. (*Id.*) Again, the millions of dollars Bodum has spent on advertising the CHAMBORD® Trade Dress for many years, as well as the significant publicity the CHAMBORD® design has received, are strong evidence of secondary meaning. *See Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1086 (7th Cir. 1988) (relying on evidence of substantial expenditures on advertising to find secondary meaning); *A.J. Canfield Co. v. Vess Beverages, Inc.*, 796 F.2d 903, 907 (7th Cir. 1986) (relying on publicity and media attention received by the plaintiff's product to find secondary meaning of the plaintiff's mark).

Because the CHAMBORD® Trade Dress is so distinctive and has been so successful, others in the industry have attempted to copy this trade dress on numerous occasions. (*Id.* ¶ 35.) Bodum vigorously enforces its rights to the CHAMBORD® iconic design, and has achieved a favorable result of removing infringing products from the marketplace more than a dozen times. (*Id.*) In fact, Bodum has served 58 cease and desist letters specific to the CHAMBORD® Trade Dress since 1995. (*Id.*) The vast majority of the time, the infringing company or individual promptly agrees to stop selling the copy French press. (*Id.*) On the occasions when the infringer did not stop selling products with knockoff designs copying the CHAMBORD® Trade Dress,

24

Bodum filed suit to product its trade dress 14 times (including this lawsuit). (*Id.*) Of the 13 prior lawsuits, eleven ended in settlements in which the defendants agreed to stop selling the product accused of infringing on the CHAMBORD® Trade Dress.[8] (*Id.*) It is, and always has been, Bodum's intention to take all appropriate legal action to enforce the CHAMBORD® Trade Dress. (*Id.* ¶ 38.) The fact that many companies have attempted to sell copies of the CHAMBORD® demonstrates the iconic nature of this product—many companies are attempting to profit on Bodum's design. (*Id.*)

Finally, the jury in this case could conclude that A Top intentionally copied Bodum. It has done so before. When determining the color for a different holiday French press, A Top asked its manufacturer to use the exact pantone color as Bodum's red French presses. (*Id.* ¶ 39.) This is some circumstantial evidence that could lead a jury to believe that A Top is continually and intentionally riding Bodum's coattails.

Given that the above-listed evidence more than sufficiently demonstrates that a reasonably jury could find that the CHAMBORD® Trade Dress has established secondary meaning, the Court should decline to grant A Top summary judgment. *See Weber-Stephen Prods.*, 2015 WL 5161347, at *6 (declining to grant summary judgment when evidence of secondary meaning existed because it is the "jury's job," not the court's, to determine whether secondary meaning exists).

## IV. CONCLUSION

For these reasons, the Court should deny A Top's motion for summary judgment.

---

[8] Of the remaining two cases, one case held that the defendant had a right to sell under a 1991 agreement (without finding against the CHAMBORD® Trade Dress). (*Id.* ¶ 36.) In addition, Bodum granted a limited license to the infringer in the remaining case. (*Id.* ¶ 37.)

Of Counsel:                                    Respectfully submitted,

David E. Bennett                               BODUM USA, INC.
Nicole J. Wing
Vedder Price P.C.
222 North LaSalle Street, Suite 2600           By:   _/s/ Nicole J. Wing_____
Chicago, IL  60601-1003                               One of Its Attorneys
(312) 609-7500
Dated:  November 3, 2017

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing ***PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE THE EXPERT TESTIMONY AND EVIDENCE OF RHONDA HARPER REGARDING LIKELIHOOD OF CONFUSION, FOR SUMMARY JUDGMENT OF NO LIKELIHOOD OF CONFUSION, AND FOR SUMMARY JUDGMENT OF NO SECONDARY MEANING*** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record on November 3, 2017.

*/s/ Nicole J. Wing*
Nicole J. Wing