**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION**

| | | |
|---|---|---|
| BODUM USA, INC. | ) | |
| | ) | |
| Plaintiff, | ) | Cause No. 1:17-cv-118 DMB-DAS |
| | ) | |
| v. | ) | Honorable Matthew F. Kennelly |
| | ) | |
| A TOP NEW CASTING INC. | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendant. | ) | |

**A TOP NEW CASTING INC.'S RESPONSE TO PLAINTIFF'S
STATEMENT OF ADDITIONAL FACTS THAT REQUIRE DENIAL
OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT REGARDING
LIKELIHOOD OF CONFUSION AND SECONDARY MEANING**

Defendant, A Top New Casting Inc. ("Defendant"), in accordance with Local Rule

56.1(b), responds to Bodum USA, Inc.'s ("Plaintiff") Statement of Additional Facts that Require

Denial of Defendant's Motion for Summary Judgment ("ASOF") as follows:

**PARAGRAPH NO. 1**

In expert discovery in this case, Bodum served the Rhonda Harper LLC Expert Report dated February 7, 2017 ("Harper Report"). (Bodum Ex. 4, Harper Report.) Ms. Rhonda Harper has significant specialized knowledge, skill, experience, training and education in the field of consumer research surveys, including consumer research surveys on the likelihood of confusion in trade dress cases. (Bodum Ex. 4, Harper Report ¶¶ 1–6, App'x A.) Bodum's counsel engaged Ms. Harper to design a consumer research survey on the issue of likelihood of confusion in this case (the "Harper Study"). (Bodum Ex. 4, Harper Report ¶ 10.)

**RESPONSE:**

Admitted for the purposes of summary judgment.

**PARAGRAPH NO. 2**

Ms. Harper designed the Harper Study based on one of two generally accepted formats for a likelihood of confusion survey and in accordance with generally accepted standards and procedures in the field of surveys, including the criteria for trustworthiness set forth in the Manual for Complex Litigation. (Bodum Ex. 4, Harper Report ¶ 15; Bodum Ex. 5, Harper Dep. Tr. at 26:12-27:16.)

**RESPONSE:**

Admitted for the purposes of summary judgment that Harper testified that she based the Harper Study on one of two generally accepted formats for a likelihood of confusions survey and in accordance with generally accepted standards and procedures in the field of surveys, including the criteria for trustworthiness set forth in the Manual for Complex Litigation. Denied to the extent that Paragraph 2 suggests Harper actually did base the Harper Study on one of two generally accepted formats for a likelihood of confusion survey and in accordance with generally accepted standards and procedures in the field of surveys, including the criteria for trustworthiness set forth in the Manual for Complex Litigation. Denied that Harper provided adequate support for her testimony or statements in her expert reports regarding the subject matter for Paragraph 2.

**PARAGRAPH NO. 3**

In the Harper Study, Survey-Monkey administered the survey. Survey-Monkey is the world's leading provider of web-based survey solutions. Survey-Monkey is used by virtually 100% of the Fortune 100, along with other businesses, academic institutions, and organizations, more than 30 million people complete its surveys on a monthly basis. (Bodum Ex. 4, Harper Report ¶ 14.)

**RESPONSE:**

Admitted for the purposes of summary judgment.

**PARAGRAPH NO. 4**

The Harper Study was administered under a double-blind protocol. Specifically, neither the respondents nor the staff of Survey-Monkey, the administrator of the survey, was informed as to the purpose or the sponsor of the Harper Study. (Bodum Ex. 4, Harper Report ¶ 16.)

**RESPONSE:**

Denied that Paragraph 4 recites the appropriate definition of a "double-blind" protocol. A "double-blind" protocol exists where "Both the interviewer and the respondent are blind to the sponsor of the survey and its purpose." Reference Guide on Survey Research at p. 411. Notably, explicit and implicit clues about the sponsor or the purpose of the survey could result in the survey no longer being "double-blind." *Id.*

Admitted for the purposes of summary judgment that the respondents and staff of Survey-Monkey were not explicitly informed of the purpose or sponsor of the Harper Survey.

**PARAGRAPH NO. 5**

In the Harper Study, participants were recruited based on meeting the nationwide universe of individuals who are ages 25 – 54 and balanced 60% and 40% for women and men, respectively. These responders were then subsequently screened during the first portion of the survey to further determine whether or not they met the universe definition as well as general industry survey participant standards. Subsequently, those potential responders who met the universe definition were invited to complete the main survey. (Bodum Ex. 4, Harper Report ¶ 17.)

**RESPONSE:**

Admitted for the purposes of summary judgment.

**PARAGRAPH NO. 6**

In designing the Harper Study, Ms. Harper relied on the fact that A Top only sells its product on Amazon.com to determine what kind of survey and what kind of stimulus would be used. In addition, because the number of people who shop on Amazon.com is virtually the total population environment, attempting to limit the universe of respondents in the Harper Study to only those individuals who shop on Amazon.com would have been unnecessary. (Bodum Ex. 5, Harper Dep. Tr. at 23:17-24:12.) For example, the vast majority of consumers are Amazon.com shoppers, including approximately 71 million people on the Amazon Prime program alone. (Bodum Ex. 5, Harper Dep. Tr. at 48:7-24.)

**RESPONSE:**

Admitted that Harper testified that she relied on the fact that A Top only sells its product on Amazon.com to determine what kind of survey and what kind of stimulus would be used. Admitted that Harper testified that, because the number of people who shop on Amazon.com is virtually the total population environment, attempting to limit the universe of respondents in the Harper Study to only those individuals who shop on Amazon.com would have been unnecessary. Admitted that Harper testified that the vast majority of consumers are Amazon.com shoppers, including approximately 71 million people on the Amazon Prime program alone.

Denied that the cited testimony supports the facts asserted in Paragraph 6 because Harper's testimony is not supported by any facts, but instead is based on her "belief." (Bodum Ex. 5, Harper Dep Tr. at 23:17-24:12; 48:7-24).

**PARAGRAPH NO. 7**

In addition, the Harper Study eliminated potential purchasers who did not have current knowledge of French Press type coffeemakers in order to eliminate bias. To ask a survey respondent about trade dress features of a product with which he or she is unfamiliar would have biased the survey. (Bodum Ex. 5, Harper Dep. at 48:7-24.)

**RESPONSE:**

Admitted that the Harper Study eliminated potential purchasers who did not have current knowledge of the term "French press coffee maker." Denied that the elimination of potential purchasers who did not have current knowledge of the term "French press coffee maker" eliminated bias or was appropriate. French press-type coffee makers have other descriptive names, including "coffee press," "plunger pot," "press pot," "coffee press plunge," and "cafetiere." (Bodum Ex. 10 at Dkt. No. 103-10 at p. 145; Dkt. No. 103-11 at pp. 2, 5, and 12).

**PARAGRAPH NO. 8**

 The Harper Study used a "line-up" methodology of products and asked which, if any, of the products are put out by the same company or affiliated or associated companies. This methodology was used because it reflects the real-world online distribution of French Press sales. The Harper Study further provided examples from Amazon.com, Google, and Google Shopping to illustrate this point. (Bodum Ex. 4, Harper Report ¶ 26.)

**RESPONSE:**

 Admitted for the purposes of summary judgment that the Harper Study used a "line-up" methodology of products and asked which, if any, of the products are put out by the same company or affiliated or associated companies. Denied that this methodology reflected the real-world online distribution of French Press sales. Denied that the examples from Amazon.com, Google, and Google Shopping illustrated that the line-up methodology in Harper's study reflected the real-world online distribution of French Press sales, as all of these examples include, at a minimum, brand and pricing information. (Bodum Ex. 4, Harper Report ¶ 26).

**PARAGRAPH NO. 9**

 In addition to one Bodum CHAMBORD® French Press coffeemaker and one A Top SterlingPro French Press coffeemaker, the Harper Study included in its "line up" of products three additional French Press coffeemakers from competing brands that embodied certain, but not all, of the elements of the CHAMBORD® trade dress. (Bodum Ex. 4, Harper Report ¶¶ 20–21, 26.)

**RESPONSE:**

 Admitted for purposes of summary judgment.

**PARAGRAPH NO. 10**

 The Harper's study's "line up" methodology created an array of products very similar to a purchasing scenario for consumers making online purchases on Amazon.com. (Bodum Ex. 5, Harper Dep. Tr. at 17:13-18:4.)

**RESPONSE:**

Denied. Harper's own expert report shows that her "line up" methodology did not resemble a purchasing scenario for consumers making online purchases on Amazon.com. (Bodum Ex. 4, Harper Report ¶ 26). For example, Harper's "line up" did not include product names, ratings, or prices, all of which are included in a purchasing scenario for consumers making online purchases on Amazon.com. (*Id.*)

**PARAGRAPH NO. 11**

In addition, as is necessary in trade dress surveys, the Harper Study isolated the factors of trade dress at issue in order to prevent confusion by survey respondents associating the trade dress at issue with, for example, pricing or brand names. Because such additional information can distract the survey respondent away from the test variable, it is common in the field of research to hide the brand name when doing trade dress research so as again not to bias the survey. For example, if survey responders view two brand names, it would be very simple for them to state that the products are put out by two different companies. In addition, the Harper Study removed brand and price information because, when viewing French Press coffeemakers on Amazon.com, it can be very difficult or even impossible to see the brand names on the products themselves. (Bodum Ex. 5, Harper Dep. Tr. at 17:13-18:4, 19:19, 21:10-20.)

**RESPONSE:**

Denied that it is necessary in trade dress surveys to remove pricing or brand names from the stimulus, as it is imperative to represent the marketplace in such a survey. *Rock-A-Bye Baby, Inc. v. Dex Prods., Inc.*, 867 F.Supp. 703, 708 (N.D. Ill. 1994). Denied that it is common in the field of research to hide the brand name when doing trade dress research. *Dwyer Instruments, Inc. v. Sensocon, Inc.*, Case No. 3:09-cv-10, 2012 WL 12281609 at *3 (N.D. Ind. Feb. 21, 2012). Denied that removal of the brand and price information was appropriate because it can be difficult to see brand names on the products themselves, as this also does not represent the marketplace. *Rock-A-Bye*, 867 F.Supp. at 708. (Bodum Ex. 4, Harper Report ¶ 26; Resp. to ASOF 14).

Admitted for the purposes of summary judgment that Harper testified as to the conclusions contained in Paragraph 11.

**PARAGRAPH NO. 12**

The Harper Study delivered statistically significant results exceeding a 95% confidence level. (Bodum Ex. 4, Harper Report ¶ 28.)

**RESPONSE:**

Admitted for purposes of summary judgment. Denied to the extent Paragraph 12 suggests this alone is sufficient to make Harper's survey reliable.

**PARAGRAPH NO. 13**

The "line up" methodology used in the Harper Study replicated the marketplace because the relevant marketplace for the Sterling Pro and Bodum French Press coffeemakers is Amazon.com On Amazom.com, these products are often shown on the same page and either side-by-side or next to each other vertically. In addition, these productions [sic] are shown outside of the package, and many times without the brand name on the product. (Bodum Ex. 5, Harper Dep. Tr. at 40:1-21.)

**RESPONSE:**

Admitted for purposes of summary judgment that the Sterling Pro and Bodum French Press coffee makers are sold on Amazon.com and are often shown on Amazon.com outside of their package. Admitted for purposes of summary judgment that products are often shown on the same page and either side-by-side or next to each other vertically.

Denied that products are often shown on Amazon.com without their associated brand name. (Bodum Ex. 4, Harper Report ¶ 26; Resp. to ASOF 14). Denied that the "line up" methodology used in the Harper study replicated the marketplace. (*Id.*)

**PARAGRAPH NO. 14**

When the "Compare to similar items" feature of Amazon.com is viewed after clicking on the webpage for a Bodum CHAMBORD® French Press coffeemaker, the following display is included in the results:



Declaration of Joshua Orewiler, attached hereto as Bodum Ex. 6.

**RESPONSE:**

Denied. The picture above is cropped to exclude the brand names, ratings, prices, and other information regarding the coffee makers returned after clicking "Compare with similar items." Counsel for A Top followed the same path on Amazon.com as counsel for Bodum when counsel for Bodum pulled the above picture. Below is an accurate representation of the results obtained from clicking on "Compare with similar items" on Amazon.com:



(Bowland Decl. at Ex. A). Denied to the extent Paragraph 14 suggests Harper relied on the results of clicking on "Compare with similar items" for her opinions in this matter.

**PARAGRAPH NO. 15**

In order to eliminate bias, the Harper Study did not include an instruction to the survey responders instructing them to imagine that they were going to a store and viewing products to purchase for themselves. Notably, French Press coffeemakers are often purchased as gifts, not necessarily to be used by the person who is making the purchase. Instead of instructing survey responders to imagine they were in a shopping state of mind, the Harper Study focused the survey responders on the trade dress at issue and on whether or not the responders believed the products shown in the array were made by the same or affiliated companies. (Bodum Ex. 5, Harper Dep. Tr. at 44:17-45:8.)

**RESPONSE:**

Admitted that Harper testified that the Harper Study did not include an instruction to the survey responders instructing them to imagine that they were going to a store and viewing products to purchase for themselves in order to eliminate bias. Denied that this procedure eliminated bias. (Dkt. No. 92-6, Keegan Decl. at ¶¶ 11-12) (hereinafter "Keegan Decl."). Admitted that Harper relied on her assertion that French press coffee makers are often purchased as gifts as justification for her failure to ask responders to imagine they were in a shopping state of mind. Denied Harper's failure to ask responders to image they were in a shopping state of mind was appropriate. (Keegan Decl. at ¶¶ 11-12). Otherwise admitted for purposes of summary judgment.

**PARAGRAPH NO. 16**

In addition, the Harper Study did not use masking questions because these questions were not necessary. Masking questions are also not commonly used in trade dress surveys. (Bodum Ex. 5, Harper Dep. Tr. at 50:22-51:20.)

**RESPONSE:**

Admitted for purposes of summary judgment that Harper testified that the Harper Study did not use masking questions. Denied that the use of masking questions was not necessary in the Harper survey. (Keegan Decl. at ¶¶ 21-22). Denied that masking questions are not commonly used in trade dress surveys. Reference Guide on Survey Research at pp. 386-87.

**PARAGRAPH NO. 17**

The Harper Study allowed the survey responders to continue viewing the product array while they answered certain survey questions because the average consumer would not have been able to memorize which of the five products, based on the random letter assigned to each product, appeared to be from the same company or affiliated companies. (Bodum Ex. 5, Harper Dep. Tr. at 28:10-17.)

**RESPONSE:**

Admitted for purposes of summary judgment that Harper testified that the Harper Study

allowed the survey responders to continue viewing the product array while they answered certain

survey questions because the average consumer would not have been able to memorize which of

the five products, based on the random letter assigned to each product, appeared to be from the

same company or affiliated companies. Denied to the extent Paragraph 17 suggests that

methodology was appropriate. (Keegan Decl. at ¶¶ 26-29).

**PARAGRAPH NO. 18**

More than one survey respondent in the Harper Study expressly stated in their open ended responses that the SterlingPro French Press coffeemaker looked like a Bodum product. (Bodum Ex. 4, Harper Report ¶ 41, at 48, 56.) For example, one survey respondent stated that "[t]hey look like Bodum French Presses. I own two types of Bodum French Presses and they both look incredibly similar to this one[.]" (Bodum Ex. 4, Harper Report at 56.)

**RESPONSE:**

Admitted for purposes of summary judgment that four survey respondents who made it to

the open-ended responses portion of the Harper Study mentioned Bodum in their open-ended

responses. Denied to the extent Paragraph 18 suggests every respondent in the Harper Study was

asked open-ended questions. (Bodum Ex. 4, Harper Report at pp. 21-23). Denied to the extent

Paragraph 18 suggests any of the open-ended responses evidenced actual confusion between any

Bodum product and the SterlingPro French Press. (Bodum Ex. 4, Harper Report at pp. 45-60).

Denied to the extent Paragraph 18 suggests the Harper survey was intended to support a claim of

secondary meaning. (Bowland Decl. at Ex. B, Sept. 20, 2017 Harper Dep. Tr. at 32:23-33:2). At least 180 respondents who responded to the Harper Study's open-ended responses section did not mention Bodum by name. (Bodum Ex. 4, Harper Report at pp. 45-60).

**PARAGRAPH NO. 19**

Bodum's CHAMBORD® French Press coffeemaker competes against A Top's Sterling Pro French Press coffeemaker. Both Bodum's CHAMBORD® French Press coffeemaker and the A Top's Sterling Pro French Press coffeemaker are sold for prices of less than $50. (Bodum Ex. 7 Himmelstrup Dep. Tr. 41:23-42:9; Bodum Ex. 8 Liang Dep. Tr. 105:8-13; Bodum Ex. 9 Bodum Dep. Tr. 101:10-21.)

**RESPONSE:**

Admitted for purposes of summary judgment.

**PARAGRAPH NO. 20**

Bodum prides itself first and foremost as a design company, and the CHAMBORD® is the icon of Bodum's design. (Bodum Ex. 10, Bodum Decl. ¶ 2.) The CHAMBORD® is the original French press design. (Bodum Ex. 10, Bodum Decl. ¶ 3.) Bodum's predecessor designed and created the CHAMBORD® in 1958 for sale in Europe, and began selling it in the United States in 1968. The CHAMBORD® design was the first French press-type coffeemaker model of its kind to be sold in Europe and the United States. (Bodum Ex. 10, Bodum Decl. ¶ 3.) In 1983, Bodum became the exclusive United States distributor of the CHAMBORD® coffeemakers, and has sold CHAMBORD® French presses in the United States from that time until the present. (Bodum Ex. 10, Bodum Decl. ¶ 4.)

**RESPONSE:**

Admitted for purposes of summary judgment.

**PARAGRAPH NO. 21**

The CHAMBORD® French Press has been sold in four sizes: 3-cup, 4-cup, 8-cup, and 12-cup. Despite the differences in these sizes, the design has remained consistent. Bodum also uses the CHAMBORD® design on products that are not coffeemakers because the unique design serves no purpose in the process of brewing coffee. (Bodum Ex. 10, Bodum Decl. ¶ 5; Bodum Ex. 1 Drainville Dep. Tr. 19:15-16.)

**RESPONSE:**

A Top objects to Paragraph 21 as not material to any issues relevant to its summary judgment motion regarding likelihood of confusion and secondary meaning. The only Bodum product at issue in this litigation is the Chambord 8 cup French press. Moreover, Bodum has only asserted trade dress in the Chambord 8 cup French press in this litigation, and the functionality of the claimed trade dress is the subject of A Top's concurrently-pending Motion to Exclude the Expert Testimony of Robert Anders and for Summary Judgment that the Claimed Trade Dress Is Functional. (Dkt. No. 88).

To the extent the Court finds Paragraph 21 material to any issues relevant to A Top's summary judgment motion regarding likelihood of confusion and secondary meaning, denied that the Bodum Chambord design serves no purpose in the process of brewing coffee. (Resp. to Plaintiff's Statement of Additional Facts that Require Denial of Defendant's Motion for Summary Judgment Regarding Functionality 18).[1] Subject to A Top's objections above, the remainder of Paragraph 21 is admitted for purposes of summary judgment.

**PARAGRAPH NO. 22**

In 1991, Bodum acquired the rights to the unique CHAMBORD® design and continued to sell the product in the United States. While no records of sales prior to 1990 are available, during the period January 1, 1990 through June 30, 1997, Bodum sold several hundred thousand CHAMBORD® French press coffeemakers which accounted for millions of dollars in sales during this early period. (Bodum Ex. 10, Bodum Decl. ¶ 6.) (The exact figures of Bodum's sales during this period are redacted in the Bodum Declaration, but are being submitted separately to the Court in an unredacted format with a motion to seal.)

**RESPONSE:**

Admitted for purposes of summary judgment except the last sentence in parentheses, which is not a statement of material fact as contemplated by the local rules. (L.R. 56.1)

---

[1] Filed concurrently in response to Dkt. No. 100.

**PARAGRAPH NO. 23**

Bodum continued to sell CHAMBORD® French presses during the period July 1, 1997 through December 31, 2004. Notably, sales of CHAMBORD® French presses increased during this time and consisted of several million dollars in sales in 2005. (Bodum Ex. 10, Bodum Decl. ¶ 7.) (More exact information regarding Bodum's increase in sales during this period is redacted in the Bodum Declaration, but are being submitted separately to the Court in an unredacted format with a motion to seal.)

**RESPONSE:**

Admitted for purposes of summary judgment except the last sentence in parentheses, which is not a statement of material fact as contemplated by the local rules. (L.R. 56.1)

**PARAGRAPH NO. 24**

Bodum has sold millions of dollars per year of CHAMBORD® design French Press coffeemakers since 2005. From January 1, 2005 to December 2016, Bodum sold millions of units of CHAMBORD® French presses in the United States (with a small amount in Canada) that generated tens of millions of dollars in sales. (Bodum Ex. 10, Bodum Decl. ¶ 8; Bodum Ex. 11, Himmelstrup Decl. ¶¶ 3–5; Bodum Ex. 7, Himmelstrup Dep. Tr. at 13:13-27:13.) (The exact figures of Bodum's sales during this period are redacted in the Bodum Declaration and the Declaration of Kasper Cameron Himmelstrup in Support of Plaintiff's Response in Opposition to Defendant's Motion to Exclude the Expert Testimony and Evidence of Rhonda Harper Regarding Likelihood of Confusion, for Summary Judgment of No Likelihood of Confusion, and for Summary Judgment of No Secondary Meaning ("Himmelstrup Decl.") but are being submitted separately to the Court in an unredacted format with a motion to seal.)

**RESPONSE:**

Admitted for purposes of summary judgment except the last sentence in parentheses, which is not a statement of material fact as contemplated by the local rules. (L.R. 56.1)

**PARAGRAPH NO. 25**

Bodum has sold the CHAMBORD® French press to numerous major retailers including Starbucks, Peet's Coffee and other coffee specialty stores, big box stores such as Target, Walmart, Bed Bath & Beyond, specialty housewares and cookware stores such as Crate & Barrel, Sur la Table and Williams-Sonoma, and department stores such as Macy's and Kohl's. Also, Bodum has a substantial relationship with Amazon, the preeminent online retailer in the United States. (Bodum Ex. 10, Bodum Decl. ¶ 9.)

13

**RESPONSE:**

    Admitted for purposes of summary judgment.

**PARAGRAPH NO. 26**

    Bodum has expended substantial funds in the years 1990 through the present for the marketing, promotion and advertising of CHAMBORD® coffeemakers. Bodum has actively promoted the CHAMBORD® French press in the United States since 1983. Bodum has used catalogs, television advertising, advertisements in trade and general circulation magazines and newspapers, exhibiting each year at the International Housewares Show in Chicago, the largest show in the United States, and other housewares shows, internet marketing, and Bodum's sales force. (Bodum Ex. 10, Bodum Decl. ¶ 11.)

**RESPONSE:**

    Admitted for purposes of summary judgment.

**PARAGRAPH NO. 27**

    Bodum expended several million dollars to advertise and promote its products during the period January 1, 1990 through June 30, 1997 by using television and advertising, exhibiting at trade shows and product demonstrations. While these expenditures were to promote all Bodum products during that period, the CHAMBORD® French press had substantial sales (it was Bodum's second largest selling product at that time) and received a significant share of promotional expenditures, including a substantial portion of the funds expended for television advertising and being featured prominently in Bodum catalogs. Bodum spent hundreds of thousands of dollars on television advertising in 1994 and 1995, which was unusual for a small company in the housewares business to do at that time. But, Bodum did so to increase the promotion of the CHAMBORD® French press in the United States. (Bodum Ex. 10, Bodum Decl. ¶ 12.) (The exact figures of Bodum's advertising expenditures are redacted in the Bodum Declaration, but are being submitted separately to the Court in an unredacted format with a motion to seal.)

**RESPONSE:**

    Admitted for purposes of summary judgment except the last sentence in parentheses,

which is not a statement of material fact as contemplated by the local rules. (L.R. 56.1)

**PARAGRAPH NO. 28**

    Bodum continued to engage in promotional activities and make substantial expenditures during the years 2005 through the present. During this period, Bodum spent tens of millions of dollars for marketing, promotional activities and advertising for its products. (Bodum Ex. 10, Bodum Decl. ¶ 14; Bodum Ex. 11, Himmelstrup Decl. ¶¶ 6–8.) While Bodum promoted its other

14

products as part of these expenditures, the CHAMBORD® French press was prominently featured in Bodum's advertising because it was Bodum's iconic and one of its best-selling products representing a significant percentage of Bodum's sales during the years 2010 through 2016. (Bodum Ex. 10, Bodum Decl. ¶ 14; Bodum Ex. 11, Himmelstrup Decl. ¶¶ 6–8, Bodum Ex. 7, Himmelstrup Dep. Tr. at 13:13-27:13.) Bodum also incurred large expenses relating to annual depreciation of exhibition fixtures (relating primarily to its booth at trade shows) of millions of dollars for marketing and promotional expenses during this period. (Bodum Ex. 10, Bodum Decl. ¶ 14; Bodum Ex. 11, Himmelstrup Decl. ¶¶ 6–8.) As a result, the CHAMBORD® , the original, iconic French press design, is well-associated with Bodum in the marketplace. (Bodum Ex. 10, Bodum Decl. ¶ 14.) (The exact figures of Bodum's advertising expenditures are redacted in the Bodum and Himmelstrup Declarations, but are being submitted separately to the Court in an unredacted format with a motion to seal.)

**RESPONSE:**

Denied that the Chambord is well-associated with Bodum in the marketplace, as Bodum's cited support comes only from Bodum employees and not consumers or the marketplace. The remainder of Paragraph 28 is admitted for purposes of summary judgment except the last sentence in parentheses, which is not a statement of material fact as contemplated by the local rules. (L.R. 56.1)

**PARAGRAPH NO. 29**

The CHAMBORD® has consistently, every year, been Bodum's "figurehead" product as well as one of its best-selling products. (Bodum Ex. 1 Drainville Dep. Tr. 28:4-18, 61:10-62:1; Bodum Ex. 10, Bodum Decl. ¶¶ 15–16; Bodum Ex. 11, Himmelstrup Decl. ¶¶ 3–5; Bodum Ex. 7, Himmelstrup Dep. Tr. at 13:13-27:13.) The CHAMBORD® is recognized in the market as the original French press and associated with Bodum. (Bodum Ex. 1 Drainville Dep. Tr. 23:9-15.) In fact, the industry has noted the CHAMBORD® to be "synonymous with Bodum." (Bodum Ex. 10, Bodum Decl. ¶ 15.)

**RESPONSE:**

Denied that the Chambord is recognized in the market as the original French press and associated with Bodum, as Bodum's cited support comes only from Bodum employees and not consumers or the marketplace. Denied that the industry has noted the Chambord to be "synonymous with Bodum," as Bodum's cited support comes only from Bodum employees not the industry. The remainder of Paragraph 29 is admitted for purposes of summary judgment.

## PARAGRAPH NO. 30

Consumers in the marketplace recognize Bodum's trade dress as associated with Bodum. (Bodum Ex. 1 Drainville Dep. Tr. 26:22-27:18, 47:9-50:2, Bodum Ex. 2 Grossenbacher Dep. Tr. 18:15-19.) The SterlingPro is nearly identical to the CHAMBORD® with minor variations having no effect on consumers' view of the overall look and feel of the products. (Bodum Ex. 1 Drainville Dep. Tr. 54:14-24, 55:21-56:5, 57:7-17; Bodum Ex. 2 Grossenbacher Dep. Tr. 35:1-23, 36:18-37:3; Bodum Ex. 9 Bodum Dep. Tr. 56:9-57:1, 59:11-16.) SterlingPro's nearly identical appearance to the CHAMBORD® has caused consumers to believe that they have a Bodum when they do not. (Bodum Ex. 2 Grossenbacher Dep. Tr. 24:2-11.)

## RESPONSE:

Denied that consumers in the marketplace recognize Bodum's trade dress as associated with Bodum, as Bodum's cited support comes only from Bodum employees and not consumers or the marketplace. (*See also* Resp. to ASOF 18). Denied that the SterlingPro is nearly identical to the Chambord with minor variations having no effect on consumers' view of the overall look and feel of the products, as Bodum's cited support comes only from Bodum employees and not consumers or the marketplace. Denied that SterlingPro's purported nearly identical appearance to the Chambord has caused consumers to believe that they have a Bodum when they do not, as the only cited evidence to support this claim does not support the proposition and is inadmissible double hearsay. Mr. Grossenbacher actually testified as follows:

Q. Have you ever heard any complaints about the Sterling Pro French press and that it's confusing people?

A. Yes, we heard.

Q. What complaints have you heard?

A. People believing that they have a Bodum and it's not a Bodum.

Q. How many people have complained to that effect?

A. I don't know exact numbers.

Q. Do you have documentation of those complaints?

A. No.

Q. So how did the complaints come in if there is no paper trail, if you will?

A. Heard them.

Q. Just in passing?

A. No, but talking to customers.

Q. You personally talked to a customer who complained about this issue about thinking they had a Bodum instead of a Sterling Pro?

A. Not personally.

Q. Who did talk to customers?

A. Colleagues.

Q. What colleagues?

A. Colleagues from the company.

Q. What are their names?

A. I don't know. I need to -- I just heard about it, so I can't give you names.

Q. You said you just heard about it. Who did you talk to?

A. It's something I heard about. I just heard saying just -- I just heard about it.

Q. Who did you hear about it from?

A. I can't remember.

Q. Was it Mr. Bodum?

A. No.

Q. And is there any paper at all that you know of that would establish any documents that would establish these complaints?

A. No.

(Bowland Decl. at Ex. C, Grossenbacher Dep. Tr. at 24:2 – 25:8). Mr. Grossenbacher's testimony regarding what his "colleagues" told him they heard from customers is double hearsay and inadmissible.

**PARAGRAPH NO. 31**

Bodum has undertaken massive efforts to promote its figurehead product and ensure that the CHAMBORD® is associated with Bodum in the marketplace. The CHAMBORD® has been featured in *hundreds* of marketplace materials, such as newspapers and magazines, in its 30-year history with Bodum. The CHAMBORD® is often featured in picturesque settings because of its stunning design. Bodum has been featured in everything from front and center in the holiday display at Crate and Barrel's flagship store, to Starbucks preferred method of coffee at home, to *Barbie's* mobile home toy. (Bodum Ex. 10, Bodum Decl. ¶¶ 17-18.)

**RESPONSE:**

Admitted for purposes of summary judgment.

**PARAGRAPH NO. 32**

Bodum has also advertised the CHAMBORD® on television, radio and online. (Bodum Ex. 10, Bodum Decl. ¶ 19.) Another key marketing tool for the CHAMBORD® is point-of-purchase advertising Bodum places with its distributors. (Bodum Ex. 10, Bodum Decl. ¶ 20.) Bodum also used the Internet to market the CHAMBORD® French press. (Bodum Ex. 10, Bodum Decl. ¶ 22.) Bodum uses its own website to promote and sell the product to retail businesses and consumers. (Bodum Ex. 10, Bodum Decl. ¶ 22.) Bodum also presently purchases Google AdWords and has done so for most of the past 10 years. (Bodum Ex. 10, Bodum Decl. ¶ 22.) Bodum also purchases ads on social media such as Facebook and Instagram and utilizes YouTube. (Bodum Ex. 10, Bodum Decl. ¶ 22.)

**RESPONSE:**

Admitted for purposes of summary judgment.

**PARAGRAPH NO. 33**

Another key area of promotion is Bodum's participation in trade shows over the past 30 years. (Bodum Ex. 10, Bodum Decl. ¶ 21.) Bodum is an established institution at trade shows. (Bodum Ex. 10, Bodum Decl. ¶ 21.) Bodum has one of the largest booths at the Chicago tradeshow every year (the largest housewares show in the country) and entertains more traffic than virtually any other supplier. (Bodum Ex. 10, Bodum Decl. ¶ 21.) The CHAMBORD® , Bodum's best-seller and most recognizable design, has been featured prominently at every single one of these trade shows. (Bodum Ex. 10, Bodum Decl. ¶ 21.)

**RESPONSE:**

Admitted for purposes of summary judgment.

**PARAGRAPH NO. 34**

The CHAMBORD® is frequently reviewed, promoted and praised. (Bodum Ex. 10, Bodum Decl. ¶ 23.) In addition, Bodum has received much other unsolicited recognition for the design of the CHAMBORD® over the years. (Bodum Ex. 10, Bodum Decl. ¶ 24.) There are also *dozens* of videos found online that promote the CHAMBORD® as the original French press coffeemaker and tout its stylish design. (Bodum Ex. 10, Bodum Decl. ¶ 25.)

**RESPONSE:**

Admitted for purposes of summary judgment.

**PARAGRAPH NO. 35**

Bodum vigorously enforces its rights to the CHAMBORD® iconic design, and has achieved a favorable result of removing infringing products from the marketplace more than a dozen times. (Bodum Ex. 10, Bodum Decl. ¶ 26.) Because of its iconic status and popularity due to Bodum's promotion of this design, infringers continue to knockoff the CHAMBORD® Trade Dress. (Bodum Ex. 10, Bodum Decl. ¶ 26.) Bodum has sent out at least 58 cease-and-desist letters since 1995 specific to the CHAMBORD® trade dress. (Bodum Ex. 10, Bodum Decl. ¶ 27.) The vast majority of the time, the infringing company or individual promptly agrees to stop selling the copy French press. (Bodum Ex. 10, Bodum Decl. ¶ 27.) If an infringer did not stop selling the CHAMBORD® knock-offs, Bodum initiated suit against the infringer. (Bodum Ex. 10, Bodum Decl. ¶ 28.) Bodum has filed 14 lawsuits (including the instant case) to protect the CHAMBORD® trade dress and has settled 12 lawsuits. (Bodum Ex. 10, Bodum Decl. ¶ 28.) In all of the settlements, except for one in which a limited license was negotiated, the infringer agreed to stop selling the accused product. (Bodum Ex. 10, Bodum Decl. ¶ 28.)

**RESPONSE:**

Denied that purported infringers continue to knockoff the purported Chambord trade dress because of its iconic status and popularity due to Bodum's promotion of this design, as Bodum cites no evidence regarding any accused infringer's intent in selling their products. Denied to the extent Paragraph 35 suggests no other third parties currently offer for sale products that closely resemble the Chambord French press, as at least fifty third parties currently offer such products for sale on amazon.com alone. (Bowland Decl. at Ex. D). The remainder of Paragraph 35 is admitted for purposes of summary judgment except to the extent that Paragraph 35 suggests that a court has ever found Bodum's trade dress valid and enforceable.

**PARAGRAPH NO. 36**

In one case, *Bodum v. LaCafetiere*, this Court ruled in 2009 that LaCafetiere had the right to sell the infringing product in the United States because of a contract Bodum had entered into with the stockholder of LaCafetiere in 1991. *Bodum U.S., Inc. v. La Cafetiere, Inc.*, No. 07 C 6302, 2009 U.S. Dist. LEXIS 25555 (N.D. Ill. Mar. 24, 2009). This Court did not consider the issue of the CHAMBORD® Trade Dress in that case—the case was decided on contractual rights alone. (Bodum Ex. 10, Bodum Decl. ¶ 29.) LaCafetiere had very little success selling its product in the market and in 2014 its parent, the Greenfield Group, entered into an agreement in which it sold this brand and the right to sell the infringing product in the United States to Lifetime Brands, Inc. Bodum promptly brought a lawsuit against Lifetime Brands and the Greenfield Group. (Bodum Ex. 10, Bodum Decl. ¶ 30.) Lifetime Brands entered into a settlement agreement agreeing not to sell the infringing products in the United States after May 31, 2016. (Bodum Ex. 10, Bodum Decl. ¶ 30.) Since the Greenfield Group sold its right to sell the knockoff products in the United States the LaCafetiere product has been excluded. (Bodum Ex. 10, Bodum Decl. ¶ 30.)

**RESPONSE:**

Denied that the LaCafetiere product was a knockoff product, as Bodum cites no evidence regarding any accused infringer's intent in selling their products. Otherwise admitted for purposes of summary judgment.

**PARAGRAPH NO. 37**

In the remaining case, *Bodum v. Culinary Parts, Inc.,* Bodum settled the case by granting a license to *Culinary Parts* to sell a modified version of the CHAMBORD® Trade Dress, which is called the "BonJour." (Bodum Ex. 10, Bodum Decl. ¶ 31.) This license was granted in connection with the settlement of related litigation between the parties in which a related company had brought a claim against Bodum in a contract matter. (Bodum Ex. 10, Bodum Decl. ¶ 31.) By virtue of entering into this license, *Culinary Parts* acknowledged the legitimacy of Bodum's trade dress. (Bodum Ex. 10, Bodum Decl. ¶ 31.) The BonJour French presses subject to this license have been a very small factor in the United States market. (Bodum Ex. 10, Bodum Decl. ¶ 31.)

**RESPONSE:**

Admitted for purposes of summary judgment.

**PARAGRAPH NO. 38**

The fact that many companies have been selling copies of the CHAMBORD® demonstrates the iconic nature of this product -- many companies are attempting to profit on Bodum's design, and Bodum is addressing all of these instances. (Bodum Ex. 10, Bodum Decl. ¶

32.) Bodum intends to continue vigilantly enforcing its trade dress of the CHAMBORD® French Press coffeemaker in order to maintain exclusivity in Bodum's rights to the CHAMBORD® trade dress. (Bodum Ex. 10, Bodum Decl. ¶ 32.)

**RESPONSE:**

Denied that many companies are attempting to profit on Bodum's design, as Bodum does not cite any evidence regarding the companies' intent in selling their products. Denied that the fact that many companies have been selling copies of the Chambord demonstrates the iconic nature of this product, as Bodum does not cite any evidence of the companies' reasons for selling their products or that the products are "copies." The remainder of Paragraph 38 is admitted for purposes of summary judgment.

**PARAGRAPH NO. 39**

A Top, on at least one occasion, has intentionally copied Bodum by asking its manufacturer to make a "holiday" French press coffeemaker (albeit not the SterlingPro) in the same exact pantone as Bodum's red French presses. (Bodum Ex. 12, e-mail produced by A Top; Liang Dep Tr. 82:3-86:1.)

**RESPONSE:**

A Top objects to Paragraph 39 as not material to the issues relevant to A Top's motion for summary judgment regarding likelihood of confusion and secondary meaning. Bodum admits Paragraph 39 is not relevant to the Chambord or SterlingPro products at issue in this matter. Moreover, Bodum has not asserted any trade dress in the red color of any of its products in this action.

To the extent the Court finds Paragraph 39 somehow material to the issues relevant to A Top's motion for summary judgment regarding likelihood of confusion and secondary meaning, A Top denies Paragraph 39 because the citations do not support the contention that A Top intentionally copied the Pantone color of a Bodum product. In particular, the cited emails show only that A Top sent its manufacturer a picture of a Bodum product to "check" its color—there is

no instruction to copy Bodum's color palate in the emails. (Bodum Ex. 12). Moreover, Mr. Liang testified only that this email reflected discussions regarding the color of A Top's new product—not that A Top had instructed its manufacturer to copy Bodum's red color. (Bodum Ex. 8, Liang Dep. at 82:3-84:7).

Dated: November 28, 2017          Respectfully submitted,

By:     */s/ Thomas G. Pasternak*  
          Thomas G. Pasternak  
          Robyn Bowland  
          Akerman LLP  
          71 South Wacker Drive  
          46th Floor  
          Chicago, Illinois 60606  
          Tel. (312) 634-5700  
          Fax. (312) 424-1900  
          thomas.pasternak@akerman.com  
          *Attorneys for Defendant,*  
          *A Top New Casting, Inc.*

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that a copy of the foregoing, **A TOP NEW CASTING INC.'S RESPONSE TO PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS THAT REQUIRE DENIAL OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT REGARDING LIKELIHOOD OF CONFUSION AND SECONDARY MEANING**, was filed on November 28, 2017, via the Court's CM/ECF system, which will automatically send notices to all counsel of record.

*/s/ Thomas G. Pasternak*
Thomas G. Pasternak