**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **BODUM USA, INC.,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | )     **Case No. 16 C 2916** |
| | ) |
| **A TOP NEW CASTING, INC.,** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Bodum USA, Inc. (Bodum) has sued A Top New Casting, Inc. (A Top) for trade

dress infringement. Bodum alleges that A Top infringed its CHAMBORD® trade dress

by promoting and selling a French press coffeemaker that is confusingly similar to

Bodum's own CHAMBORD® coffeemaker. A Top has moved to exclude the testimony

and survey evidence of Bodum's experts and for summary judgment on three separate

grounds: (1) Bodum's claimed trade dress is functional, (2) there is no likelihood of

confusion, and (3) Bodum's claimed trade dress has no secondary meaning. For the

reasons stated below, the Court denies A Top's motions.

### Background

A French press, or coffee press, is a non-electric, manually-operated

coffeemaker. To brew coffee in a French press, the user places ground coffee into the

container and adds boiling or near-boiling water. After a few minutes, the user presses

the coffee grounds to the bottom of the container with a piston or "plunger," thereby

separating the grounds from the liquid coffee.

Bodum's claimed CHAMBORD® trade dress is the "overall design" of the Chambord French press coffeemaker.  Compl. ¶ 11.  Features of the CHAMBORD® trade dress claimed by Bodum include the frame, feet, handle, lid, safety lid, and the carafe and plunger.  Bodum alleges that A Top's Chrome SterlingPro coffeemaker is confusingly similar to the CHAMBORD® coffeemaker[1] in overall appearance.  Both products are sold nationwide for under fifty dollars on Amazon.com.

The CHAMBORD® was the first French press-style coffeemaker model of its kind to be sold in Europe and the United States.  Bodum's predecessor began selling the CHAMBORD® French press in the United States in 1968.  In 1983, Bodum became the exclusive distributor of CHAMBORD® coffeemakers in the United States, and it has continued to promote, advertise, and sell CHAMBORD® coffeemakers in the United States since that time.  Bodum acquired the rights to the CHAMBORD® design in 1991.  Bodum has promoted the CHAMBORD® French press and other products through catalogs, television and radio advertising, advertisements in trade and general circulation newspapers and magazines, internet marketing, exhibitions at housewares shows, and use of its sales force.

The CHAMBORD® coffeemaker has consistently been one of Bodum's best-selling products.  Between January 1, 1990 and June 30, 1997, Bodum sold over 350,000 CHAMBORD® coffeemakers, accounting for millions of dollars in sales.  Annual sales approximately tripled from 1996 to 2005, and from January 2005 through

---

[1] The CHAMBORD® coffeemaker is occasionally referred to as "The Original French Press Bodum" in the expert report of Robert Anders.

December 2016, Bodum sold over five million CHAMBORD® coffeemakers in the United States.  In addition to its Amazon.com sales, Bodum has sold the CHAMBORD® French press to a number of major retailers, including Starbucks, Target, Walmart, Crate & Barrel, and Macy's.

Over the years, a number of competitors have promoted and offered for sale coffeemakers that closely resemble Bodum's CHAMBORD® French press.  Since 1995, Bodum has sent over 50 cease-and-desist letters regarding the CHAMBORD® trade dress, and it has filed 14 lawsuits, including this one.

Industrial designer Robert Anders prepared an expert report for Bodum regarding its product design based on his examination of a number of coffee press products, including Bodum's CHAMBORD® "The Original French Press Bodum" and two similar versions of A Top's SterlingPro.[2]  Anders evaluated the CHAMBORD® product design first by categorizing the features as either functional or non-functional and then by identifying the non-functional features as dominant, sub dominant, and subordinate design elements.  He concluded that the overall appearance or design of Bodum's CHAMBORD® coffeemaker is "not based on 'de jure' functionality [sic] features, and is therefore entitled to trade dress protection."  Pasternak Decl., Sept. 22, 2017, Ex. 3 (Anders Report) ¶ 24.  He also concluded that there is a "significant opportunity for a likelihood of confusion" between both versions of the SterlingPro and "The Original French Press Bodum" trade dress based on the products' overall appearance.  *Id.* ¶ 61.

Bodum also retained Rhonda Harper LLC (Harper), a marketing and consumer

---

[2] Anders evaluated a SterlingPro coffee press with four feet and another with three feet. He stated that it was his understanding that the SterlingPro with four feet is no longer depicted on the Amazon website.

research professional, to create and analyze a survey to gauge the likelihood of confusion regarding the sources of the SterlingPro and the CHAMBORD® coffeemakers.  Harper limited the universe of survey participants to those who responded "Yes" to the question "Have you ever purchased, or would you ever consider purchasing, a French Press Coffee Maker?"  Pasternak Decl., Sept. 25, 2017, Ex. 3 (Harper Report), at 39.  The survey, administered via SurveyMonkey, presented participants with a photo array of five different French press coffeemakers.  The photo array consisted of both the SterlingPro and CHAMBORD® products and three additional French press coffeemakers that included some, but not all of the features claimed as part of the CHAMBORD® trade dress.  The order in which the five coffeemakers were presented was randomized to prevent bias.  The photo array did not include product name, brand name, or any other information about the coffeemakers.  After giving participants an opportunity to review the photo array, the survey asked the following question:

> Do you think that each of these French Press Coffee Makers is from a separate company, or do you think that two or more are from the same company, or are affiliated or connected [in any way]?  If you don't know, please feel free to say so.

*Id.* at 41.  Participants were provided with four possible responses:

- o Each is put out by a separate company
- o Two or more are from the same company
- o Two or more are put out by companies that are affiliated or associated with each other
- o Don't Know, Other, or None of the Above

*Id.*  The first three responses were presented in random order to guard against bias.  If a participant answered that two or more were from the same company or by affiliated or associated companies, she was shown the photo array again and was asked to identify

which of the products she believed to be from the same or affiliated/associated

companies.  The survey then asked the participant the following open-ended question:

"Why do you say that?  Please be as specific as possible."  *Id.* ¶ 24.

The Harper Report indicates that, of the 488 participants who completed the

survey, 215 participants (44.05 percent) said that they believed that two or more of the

five coffeemakers depicted in the photo array were from the same company or affiliated

or associated companies.  *Id.* ¶¶ 34, 36.  Another 191 participants (39.15 percent)

believed the SterlingPro and the CHAMBORD® coffeemakers were from the same

company or by associated or affiliated companies.  *Id.* ¶¶ 35, 40.  More specifically, 159

participants (32.59 percent) identified only the SterlingPro and the CHAMBORD®

products as being from the same or associated/affiliated companies, *id.* ¶¶ 35, 37; an

additional 32 participants (6.56 percent) identified the SterlingPro and the

CHAMBORD® and one or more of the other three coffeemakers as being from the

same company or associated/affiliated companies.  *Id.* ¶¶ 35, 38.[3]  The Harper Report

concludes that these survey results show a "strong likelihood of confusion among

---

[3] The report's discussion of the survey results is not a model of clarity.  Part of this
confusion is due to an apparent misreporting in one section of the report of the number
of participants who identified the SterlingPro and the CHAMBORD® products, and no
other coffeemakers, as being from associated or affiliated companies.  The report states
that 115 participants (23.57 percent) identified the SterlingPro and the CHAMBORD®
products, and no other coffeemakers, as being from the same company.  *Id.* ¶¶ 37, 41.
One section of the report indicates that an additional 44 participants (9.02 percent)
identified the SterlingPro and the CHAMBORD® products, and no other coffeemakers,
as being from affiliated or associated companies.  *Id.* ¶ 37.  In a subsequent section,
however, the report states that just 14 participants "indicated that only Bodum and
Sterling Pro French Presses came from associated / affiliated companies." *Id.* ¶ 43.
Because Harper's likelihood of confusion calculations rely on 44 participants identifying
the SterlingPro and the CHAMBORD® products, and no other coffeemakers, as being
from associated or affiliated companies, *id.* ¶¶ 35, 45, it appears that the later reference
to 14 participants may be an error.

consumers" with respect to the source of the SterlingPro and the CHAMBORD®
coffeemakers. *Id.* ¶ 45.

Bodum brought this action against A Top in March 2016. The complaint includes
three claims: trade dress infringement in violation of section 43(a) of the Lanham Act,
15 U.S.C. § 1125(a), common law unfair competition, and violation of the Illinois
Uniform Deceptive Trade Practices Act, 815 ILCS 510/2.

### Discussion

To prevail on a trade dress infringement claim where the trade dress is
unregistered, a plaintiff must establish that (1) the claimed trade dress is non-functional,
(2) the claimed trade dress has acquired secondary meaning, and (3) a likelihood of
confusion exists between the trade dress of the plaintiff and that of the defendant. *See*
15 U.S.C. § 1125(a)(3); *Incredible Techs., Inc. v. Virtual Techs., Inc.*, 400 F.3d 1007,
1015 (7th Cir. 2005).

A Top has moved for summary judgment on all of Bodum's claims. A Top
contends that no reasonable factfinder could find that Bodum's claimed trade dress is
not functional, that there is a likelihood of confusion as to the source of A Top's
SterlingPro, or that Bodum's claimed trade dress has acquired secondary meaning. A
Top also argues as part of its motions for summary judgment that the Court should
exclude the testimony of Bodum's expert witnesses, Robert Anders and Rhonda Harper,
and the Harper survey pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell
Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The Court will address the
admissibility of Bodum's expert witness testimony before turning to A Top's summary
judgment arguments.

**A.    Motions to exclude expert testimony**

**1.    Legal standard**

Federal Rule of Evidence 702, which governs the admissibility of expert testimony, states as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. As the Supreme Court explained in *Daubert*, a district judge must ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. The party seeking to introduce expert witness testimony bears the burden of demonstrating, by a preponderance of the evidence, that it satisfies the *Daubert* standard. *Krik v. Exxon Mobil Corp.*, 870 F.3d 669, 673 (7th Cir. 2017).

In deciding whether expert testimony is sufficiently reliable, "the role of the court is to determine whether the expert is qualified in the relevant field and to examine the methodology the expert has used in reaching his conclusions." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). Factors that district courts typically should consider when assessing the reliability of expert testimony include "(1) whether the proffered theory can be and has been tested; (2) whether the theory has been subjected

to peer review; (3) whether the theory has been evaluated in light of potential rates of error; and (4) whether the theory has been accepted in the relevant scientific community."  *Gopalratnam v. Hewlett-Packard Co.*, No. 17-1810, 2017 WL 6398070, at *4 (7th Cir. Dec. 15, 2017) (citation omitted).  Ultimately, however, the reliability inquiry is a case-specific one.  *See C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 835 (7th Cir. 2015).  What is most important is that the district court ensure that the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Ford Motor Co.*, 215 F.3d at 719 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).

Questions regarding the correctness of the expert's conclusions and assessments of his or her credibility, by contrast, are typically the province of the jury. *See Daubert*, 509 U.S. at 595; *Ford Motor Co.*, 215 F.3d at 719.  A court may properly exclude expert testimony under Rule 702 where there is simply no rational connection between the data and the opinion offered.  *Gopalratnam*, 2017 WL 6398070, at *6. Nonetheless, the threshold *Daubert* inquiry into relevance and reliability "is not designed to have the district judge take the place of the jury to decide ultimate issues of credibility and accuracy."  *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012).  As the Supreme Court reiterated in *Daubert*, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *Daubert*, 509 U.S. at 596.

### 2.    The Anders report

Although A Top does not challenge Anders's qualifications to offer expert

testimony on the issue of functionality, it argues that his testimony should be excluded as unreliable and irrelevant under Rule 702 and *Daubert*.  A Top contends that Anders's functionality analysis is irrelevant and unreliable (and thus inadmissible) because he evaluated a different trade dress than the one at issue in this case.  Specifically, A Top argues that the trade dress analyzed by Anders differs from the CHAMBORD® trade dress claimed by Bodum for two reasons.  First, according to A Top, Anders analyzed what *he* believed to be the CHAMBORD® trade dress, rather than what Bodum claims as the trade dress.  Second, A Top contends that Anders improperly excluded the elements he deemed functional from his functionality analysis of the overall trade dress, even though those elements were part of Bodum's claimed trade dress.  A Top also argues that Anders's testimony should be excluded as irrelevant because he failed to apply the appropriate legal test for trade dress functionality.  The Court takes each of these arguments in turn.

A Top says that deposition testimony from Anders shows that his expert report analyzed a trade dress different from the CHAMBORD® trade dress asserted by Bodum in this case.  A Top points to the following exchange as evidence of the alleged mismatch:

> Q. Did you analyze what Bodum claims as its trade dress in this case or what you thought the trade dress was in this case?
>
> A. I indicated what I thought the trade dress was, not what Bodum thought it was.
>
> Q. And that's what you analyzed in this case?
>
> A. I analyzed the product, and I determined from my perspective what the trade dress was.

Pasternak Decl., Sept. 22, 2017, Ex. 6 (Anders Dep., Sept. 20, 2017), at 14:15-14:23.

A Top contends that Anders evaluated the following elements of "The Original French Press Bodum" coffeemaker: "(1) a cylindrical internal form, (2) a circular perforated plunger, (3) horizontal narrow circumferential polished metal band linked to narrow vertical bands that form the feet, (4) handle, (5) polished dome top, and (6) spherical handle centered on the domed top." Def.'s Mem. in Support of Mot. to Exclude the Expert Testimony of Robert Anders and for Summ. J. that the Claimed Trade Dress is Functional at 8. A Top asserts that Bodum's claimed trade dress, by contrast, consists of a frame, feet, a handle affixed to the frame with bolts, a lid, a safety lid, and the carafe and plunger. A Top contends that because Anders did not consider the handle bolts or the safety lid to be part of the trade dress, he did not evaluate the same trade dress claimed by Bodum.

A Top's focus on relatively minor differences in the manner in which Bodum and Anders define the CHAMBORD® trade dress misses the mark. The Seventh Circuit has recognized that a trade dress may encompass "the total image or overall appearance of a product, including size, shape, color, texture, and graphics." *AM Gen. Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 814 (7th Cir. 2002) (internal quotation marks and citations omitted); *see also Badger Meter, Inc. v. Grinnell Corp.*, 13 F.3d 1145, 1151 (7th Cir. 1994) ("'Trade dress' refers to the total image of a product, including size, shape, color combinations, graphics, packaging and label."). To assert a claim for trade dress infringement concerning the overall appearance of a product, however, courts have typically required plaintiffs to articulate the specific, tangible elements that, together, comprise that claimed "overall appearance" trade dress. *See, e.g.*, *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 634-

35 (6th Cir. 2002); *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 381

(2d Cir. 1997); *Weber-Stephen Prod. LLC v. Sears Holding Corp.*, No. 13-CV-01686,

2013 WL 5782433, at *3 (N.D. Ill. Oct. 25, 2013).

As A Top notes, Bodum does indeed identify individual, tangible elements that

form part of the claimed trade dress both in the complaint and in the interrogatory

answers. Nonetheless, Bodum's trade dress infringement claim is based on the "overall

design" or "overall appearance" of the CHAMBORD® French Press coffeemaker.

Compl. ¶¶ 11, 19. The Anders Report repeatedly indicates that Anders, too, considered

the overall appearance of the CHAMBORD® coffeemaker in his trade dress analysis.

Anders Report ¶¶ 24, 41, 49, 53, 57. Although Anders stated in his deposition

testimony that he did not consider the cylindrical carafe in his "trade dress analysis,"

Anders Dep., Sept. 20, 2017, at 16:15-16:18, he stated immediately afterward, "[b]ut in

the overall appearance you include the cylindrical transparent carafe." *Id.* at 16:18-

16:19. The fact that Anders's deposition testimony appears to have been, at times,

unclear or inconsistent regarding what elements he considered as part of his trade

dress analysis may be an issue for A Top to explore on cross-examination, but it is not a

basis to exclude Anders's testimony. *See Daubert*, 509 U.S. at 596 ("vigorous cross-

examination" is the appropriate way to attack "shaky but admissible evidence").

A Top also argues that Anders improperly excluded functional elements before

analyzing trade dress functionality, thereby further differentiating the trade dress he

analyzed from the CHAMBORD® trade dress claimed by Bodum. Here, too, Anders's

deposition testimony is less than clear. He testified that he did not include functional

elements in his trade dress analysis but instead limited his "discussion of dominant,

subdominant and subordinate elements in the trade dress analysis" to the elements he identified as non-functional.  Pasternak Decl., Sept. 22, 2017, Ex. 5, at 49:22-50:5.  When asked whether it was his opinion that "only the dominant design element forms the trade dress," however, Anders replied, "No, it's the overall appearance and a combination of all the elements."  *Id.* at 50:15-50:18.  Moreover, the Anders Report itself states the conclusion that the "overall design configuration" of the CHAMBORD® coffeemaker (specifically, "The original French press Bodum") is not based on functional features.  Anders Report ¶ 57.  Once again, the apparent inconsistencies are topics for cross-examination, not a basis to exclude Anders's testimony.  *See Ford Motor Co.*, 215 F.3d at 719.

Lastly, A Top contends that Anders's testimony should be excluded because his functionality analysis relies exclusively on the existence of alternative designs, which, according to A Top, does not comport with the governing legal standard for functionality.  *See TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 32 (2001) (a trade dress is functional "if it is essential to the use or purpose of the article or if it affects the cost or quality of the article") (citation omitted).  A Top argues that the existence of alternative designs is not enough, by itself, to prove that a trade dress is non-functional.

It is true that, in *TrafFix*, the Supreme Court noted that it was not necessary to speculate about other design possibilities where the functionality of design feature in question had already been established.  *Id.* at 33-34.  It is also undisputed, as the Seventh Circuit explained in *Arlington Specialties, Inc. v. Urban Aid, Inc.*, 847 F.3d 415, 419 (7th Cir. 2017), that "a design need not be the only way to do things to be functional; it need only represent[ ] one of many solutions to a problem."  (internal

quotation marks and citation omitted) (alteration in original).  Nonetheless, at least where it is not otherwise established that a trade dress is essential to the product's use or purpose or that it affects the cost or quality of the product, the existence of alternative designs remains a relevant consideration in deciding whether a claimed trade dress is functional.  *See id.* at 420 ("Alternative designs can be 'part of the total evidentiary matrix to be weighed' in deciding whether claimed trade dress is functional.") (quoting 1 McCarthy on Trademarks and Unfair Competition § 7:75 (4th ed. 2008)); *Georgia-Pac. Consumer Prod. LP v. Kimberly-Clark Corp.*, 647 F.3d 723, 727-28 (7th Cir. 2011) (listing alternative designs as one factor to consider in determining whether a design is functional).

An expert's testimony is relevant if it "will assist the trier of fact with its analysis of *any* of the issues involved in the case."  *Ford Motor Co.*, 215 F.3d at 718 (emphasis added).  Anders's testimony on functionality, based as it is on his design analysis of "The Original French Press Bodum," meets that standard, because it will assist the jury both in determining whether the overall appearance of the CHAMBORD® coffeemaker is non-functional and in determining likelihood of confusion involving the source of the SterlingPro and "The Original French Press Bodum."  A Top does not question Anders's qualifications as a design expert or the reliability of the underlying methodology he used to evaluate the products' design elements.  The Court concludes that there is a rational connection between the data Anders used and the opinion he offers.  It is up to the jury to determine the correctness of Anders's conclusions and the credibility of his opinion.  The Court therefore denies A Top's motion to exclude Anders's proposed testimony and report.

### 3. The Harper survey and report

A Top argues that Harper's survey and related testimony are so severely flawed that they should be excluded under *Daubert* and Rule 702. A Top does not contest Harper's qualifications to conduct the survey or testify regarding likelihood of confusion. Rather, it contends that the survey was not representative of the marketplace and that it failed to select the appropriate study universe and to use masking questions to minimize sampling bias. A Top also argues that the survey results are unreliable not only because the photo array was left on the screen while participants answered the relevant questions, but also because Harper did not properly account for baseline confusion from the control data.

To be admissible, survey evidence "must comply with the principles of professional survey research." *Evory v. RJM Acquisitions Funding LLC*, 505 F.3d 769, 776 (7th Cir. 2007). Specifically, "[t]he closer the survey methods mirror the situation in which the ordinary person would encounter the trademark, the greater the evidentiary weight of the survey results." 6 McCarthy on Trademarks and Unfair Competition § 32:163 (5th ed. 2017) (McCarthy). Additional factors affecting the reliability of survey evidence include whether the survey "universe" was properly defined, whether questions were clear, precise, and non-leading, whether "the objectivity of the entire process was ensured," whether the data was accurately reported, and whether the data was analyzed "in accordance with accepted statistical principles." *LG Elecs. U.S.A., Inc. v. Whirlpool Corp.*, 661 F. Supp. 2d 940, 952 (N.D. Ill. 2009). Shortcomings in survey results typically affect the weight of the survey, not its admissibility. *See AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 618 (7th Cir. 1993); *Black &*

*Decker Corp. v. Positec USA Inc.*, No. 11-CV-5426, 2017 WL 4010922, at *3 (N.D. Ill. Sept. 11, 2017). Although "there will be occasions when the proffered survey is so flawed as to be completely unhelpful to the trier of fact and therefore inadmissible, such situations will be rare." *AHP*, 1 F.3d at 618 (citation omitted).

Most likelihood of confusion surveys are adaptions of one of two formats. Jerre B. Swann, *Eveready and Squirt-Cognitively Updated*, 106 Trademark Rep. 727, 727-28 (2016). In the "Everready" format, survey respondents are shown the defendant (junior) mark and "search for *similarities* (a 'fit') with any senior [plaintiff] brand information accessible in their memory." *Id.* at 728 (emphasis in original). In the "Squirt" format, respondents are shown an array of marks, including the senior and junior marks, in a manner that is designed to replicate the marketplace where the products are sold, and are asked whether they believe the marks come from the same or affiliated companies and if so, why. Jerre B. Swann, *Likelihood of Confusion Studies and the Straitened Scope of Squirt*, 98 Trademark Rep. 739, 749 (2008).

Harper testified during her deposition that the Harper survey adopted a "Squirt" format. Participants in the study were shown a photo array of five different French press coffeemakers side by side. In her report, Harper explains that she used this methodology to reflect the real-world online shopping experience on Amazon.com, Google, and Google Shopping, in which images of comparable products are displayed side by side (both A Top and Bodum sell their coffeemakers on Amazon). Through its own expert, Mark Keegan, A Top contends that Harper failed to adequately replicate the online marketplace because she did not include additional product information—brand name, product name, pricing, etc.—below the images, even though such information is

included in online comparisons of products.  Harper testified that she chose not to

include pricing or brand names or other product information in her array in order to

avoid distracting consumers from the trade dress test variable.  Pl.'s Resp. to Def.'s

Statement of Material Facts in Support of its Mot. to Exclude the Expert Testimony and

Evidence of Rhonda Harper and for Summ. J. Regarding No Likelihood of Confusion or

Secondary Meaning, Ex. 5 (Harper Dep.) at 17:16-18:19.  In a case like this one, where

the claimed trade dress is the overall appearance or design of the product, it stands to

reason that including additional product information in the array would have made it

more difficult to identify the cause of any confusion regarding the source of the

products.  The trade-off is that a factfinder may decide that the omission of that

information results in a less accurate replica of an online marketplace, thereby

diminishing the weight of the survey.  *See* McCarthy § 32:163.  This factor, however,

does not make the survey inadmissible.

A Top further contends that the Harper survey "universe"—the population from

which the survey sample is taken—is flawed because it encompasses all those who

have purchased or would consider purchasing a French press coffee maker of any kind.

A Top argues that this universe is too broad and that the appropriate universe is limited

to potential purchasers of the SterlingPro coffeemaker, the junior user of the trade dress

allegedly infringed.  A Top complains that the Harper study universe may include users

who do not shop online, even though the SterlingPro is only sold online.  And A Top

also argues that the survey universe is too narrow because it excludes people who do

not know what a French press is.

The first of these arguments lacks merit.  As Bodum points out, the survey was

conducted online, so it is highly unlikely that it included respondents who do not shop online.  As for the second argument, the universe chosen for the survey is relevant because it is focused on past or potential purchasers of French press coffeemakers. There may be some online shoppers who discover French press-style coffeemakers for the first time while searching for other coffee-related products and decide to purchase one, and a jury may determine that their exclusion from the survey diminishes the weight of its results.  But this is not so problematic by itself or in combination with the other potential flaws A Top cites to warrant excluding the survey in its entirety.  *Cf. Black & Decker Corp. v. Positec USA Inc.*, No. 11-CV-5426, 2015 WL 5612340, at *18 (N.D. Ill. Sept. 22, 2015) (over- or under-inclusiveness of survey universe goes to weight rather than admissibility of survey).  A Top's additional complaint that the question used by the Harper study to narrow the universe ("Have you ever purchased, or would you ever consider purchasing, a French Press Coffee Maker?"), could have resulted in sampling bias likewise goes only to the weight of the survey.

A Top further contends that, because the Harper survey left the photo array in front of survey participants while they answered the relevant likelihood of confusion questions, the survey simply subjected participants to a "matching game."  Pasternak Decl., Sept. 25, 2017, Ex. 6 (Keegan Decl.) ¶ 28.  A Top cites no authority that suggests that leaving the stimulus in view during a Squirt-style survey is an unacceptable methodological choice.  Instead, A Top simply cites its own expert's opinion that "[r]emoving the products from view tends to elicit the most objective opinions from consumers regarding confusion, as their assessments are necessarily based on recall and cognition rather than forensic examination."  *Id.* ¶ 27.  Harper explained during her

deposition that she chose to leave the photo array in view because she did not believe the average consumer otherwise would have been able to remember "five different sets of information" (corresponding with the five different coffeemakers they were shown). Harper Dep. at 28:10-28:17. In this case, the Court does not find that Harper's decision to leave the photo array in front of survey participants for reference places her study outside the bounds of professional survey research.

Lastly, A Top takes issue with what it characterizes as Harper's failure to properly calculate the net likelihood of confusion. A Top argues Harper should have considered all responses that identified one or more of the non-Bodum, non-A Top products in the array as being from the same or affiliated companies as "noise," or baseline confusion, that must be deducted from the overall rate of confusion. What is left after that, A Top contends, is what matters: the net likelihood of confusion that is specifically attributable to the claimed trade dress. Although Harper does not address the issue in her report, Bodum counters that this step is not necessary where the three other products in the array "were selected based on the fact that they embodied certain, but not all, of the elements present in the CHAMBORD® trade dress." Pl.'s Resp. to Def.'s Mot. to Exclude the Expert Testimony of Rhonda Harper and for Summ. J. Regarding No Likelihood of Confusion or Secondary Meaning at 17. The Court does not doubt the importance of identifying and accounting for baseline confusion. *See* McCarthy § 32:187. Whether (and if so, how) Harper accounted for noise within the context of this particular survey is another topic that bears exploration on cross-examination; it will be up to the trier of fact to decide how much weight to afford the survey after this issue has been thoroughly aired. *See LG Elecs.*, 661 F. Supp. 2d at 956 ("Evaluating technical

deficiencies and awarding weight to this evidence is the province of the trier of fact.").

The Court concludes that this is not one of those rare cases in which the proffered survey is "so flawed as to be completely unhelpful to the trier of fact and therefore inadmissible." *AHP*, 1 F.3d at 618. The Court concludes that Harper's testimony meets the threshold requirements of *Daubert* and Rule 702 in that it will help the trier of fact assess likelihood of confusion, it is based on sufficient data, it is the product of sufficiently reliable principles and methods, and Harper has reliably applied those methods and principles to the facts of this case. *See* Fed. R. Evid. 702; *Daubert*, 509 U.S. at 597. It will be up to the jury to determine how much weight to give Harper's testimony.

**B.     Motions for summary judgment**

On summary judgment, a court views the record in the light most favorable to the non-moving party, drawing all reasonable inferences in favor of that party. *Trinity Homes LLC v. Ohio Cas. Ins. Co.*, 629 F.3d 653, 656 (7th Cir. 2010). Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," a genuine issue of material fact exists, and summary judgment is therefore inappropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**1.     Whether Bodum's claimed trade dress is functional**

A Top contends that it is entitled to summary judgment on the issue of functionality because Bodum has not produced sufficient evidence from which a reasonable factfinder could conclude that the CHAMBORD® trade dress is non-

functional.  Specifically, A Top asserts that Bodum's evidence of alternative designs is, by itself, insufficient evidence that its claimed trade dress is non-functional.

A plaintiff asserting a trade dress infringement claim based on an unregistered trade dress bears the burden of proving that the claimed trade dress is not functional. 15 U.S.C. § 1125(a)(3); *Arlington Specialties*, 847 F.3d at 418.  A product feature is functional "if it is essential to the use or purpose of the article or if it affects the cost or quality of the article."  *TrafFix*, 532 U.S. at 32 (internal citations and quotations omitted). A feature that is a "competitive necessity" such that its exclusive use would place competitors at a "significant non-reputation-related disadvantage" is also deemed functional.  *Arlington Specialties*, 847 F.3d at 419 (internal quotation marks omitted).

> To determine whether a design is functional, courts look to a number of factors:
>
> (1) the existence of a utility patent, expired or unexpired, that involves or describes the functionality of an item's design element; (2) the utilitarian properties of the item's unpatented design elements; (3) advertising of the item that touts the utilitarian advantages of the item's design elements; (4) the dearth of, or difficulty in creating, alternative designs for the item's purpose; (5) the effect of the design feature on an item's quality or cost.

*Georgia-Pacific*, 647 F.3d at 727-28.  Although A Top argues that proof of alternative designs by itself is always insufficient to prove non-functionality, the authorities it cites actually stand for the narrower proposition that alternative designs need not be considered if the trade dress in question has already been determined functional by other means.  *See TrafFix*, 532 U.S. at 33-34 (no need to consider alternative design possibilities where functionality of claimed trade dress has been established); *Arlington Specialties*, 847 F.3d at 420 (where the undisputed evidence shows that the claimed design features affect product quality, no need to consider alternative designs); *Specialized Seating, Inc. v. Greenwich Indus., LP*, 616 F.3d 722, 726-27 (7th Cir. 2010)

(finding functionality despite numerous alternative designs where the trademark design was functional as a unit and every important element was independently functional); *see also Georgia-Pacific*, 647 F.3d at 731 ("Accordingly, because we find the design to be functional, the fact that there are numerous alternative designs does not, on its own, render the design nonfunctional and incidental.").  In this case, it is appropriate to consider the existence of alternative designs as one of the factors bearing on functionality.

The first three factors appear to favor A Top's position.  Although the overall design of Bodum's claimed trade dress has never been the subject of a utility patent, Bodum's U.S. Patent No. 8,695,486 does describe the functionality of a number of individual features that are included in the claimed trade dress: the lid, the safety lid, the cylindrical carafe, and the plunger.  Def.'s Resp. to Pl.'s Stat. of Add'l Facts that Require Denial of Def.'s Mot. for Summ. J. Regarding Functionality, Ex. A.  This weighs strongly in favor of a finding of functionality, at least with respect to those particular elements. *See TrafFix*, 532 U.S. at 29-30.  The Anders Report itself concludes that the cylindrical internal form and the plunger are functional.  Anders Report ¶ 44.  And at least some of Bodum's advertising weighs in favor of a finding of functionality with respect to certain elements of the trade dress.  For example, one advertisement touts the CHAMBORD® coffeemaker's "double nickel plus chromium finish with high gloss" as creating a "thicker, more durable protective metal casing."  Def.'s Resp. to Pl.'s Stat. of Add'l Facts that Require Denial of Def.'s Mot. for Summ. J. Regarding Functionality, Ex. B at 5.  Another notes that the safety lid "prevents the splashing of liquids," the knob on the plunger is made of "heat-resistant" plastic, and the plastic handle "keeps your fingers

from getting burnt." *Id.* at 7. Even if most of a product's elements are functional, however, the design of a product whose overall appearance is distinctive due to non-functional aspects of the design is protectable. *Specialized Seating*, 616 F.3d at 727.

The fourth and fifth factors support Bodum's position that the overall trade dress is non-functional. In addition to providing evidence of a wealth of alternative French press designs, the Anders Report also identifies a number of features of the claimed trade dress that Anders concludes are "merely ornamental, incidental, or arbitrary." Anders Report ¶ 45. These include "a horizontal narrow circumferential polished metal band that is linked to narrow vertical bands . . . which extends below and outwardly to form the products [sic] feet," the black handle attached with a fastener to the circumferential metal band, the "polished domed top," and "the spherical handle centered on the domed top." *Id.* Anders also opines that "overall appearance" of "The Original French Press Bodum" is not dictated by the functionality of the cylindrical carafe or plunger but is instead "expressed by the combination of the other, non-functional elements." *Id.* ¶ 41.

Finally, Bodum argues that the existence of numerous alternative French press coffeemaker designs that are priced lower than the CHAMBORD® coffeemaker is evidence that its trade dress has no effect on quality or cost. A Top contends that the existence of lower-priced products with alternative designs says nothing about whether the trade dress affects the quality of the product and, thus, Bodum's ability to sell it at a higher price point. The declaration of Bodum CEO Joergen Bodum explains, however, that although the CHAMBORD® coffeemaker is made with high-quality materials, "the particular design has nothing to do with the quality . . . which is determined by the

quality of the materials chosen, and the manufacturer's machinery, skill and care with which the products are manufactured . . . . [T]he ultimate quality results from the manufacturing choices made by the manufacturer and is not related to the design aesthetic."  Decl. of Joergen Bodum in Support of Pl.'s Resp. to Def.'s Mot. to Exclude the Expert Testimony of Robert Anders and for Summ. J. that the Claimed Trade Dress is Functional ¶ 9.

Thus, some of the factors arguably favor A Top, and others arguably favor Bodum.  Drawing all reasonable inferences in favor of Bodum, the Court concludes that a reasonable juror could find the overall appearance of the CHAMBORD® coffeemaker non-functional.  The Court therefore denies A Top's motion for summary judgment on the question of functionality.

### 2.    Likelihood of confusion

A Top argues that summary judgment is warranted on the question of likelihood of confusion because Bodum has not pointed to admissible evidence from which a reasonable factfinder could conclude that a likelihood of confusion exists.

"Likelihood of confusion" refers to the likelihood of confusion "as to the origin of the defendant's product."  *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 897 (7th Cir. 2001) (citation omitted).  To determine whether a likelihood of confusion exists, courts consider the following factors:

(a) the similarity of the trademarks or trade dresses;

(b) the area and manner of concurrent use (including the similarity of the products on which the trademarks or trade dresses are being used);

(c) the degree of care likely to be used by consumers;

(d) the strength of the plaintiff's trade dress;

(e) actual confusion; and

(f) whether the defendant intended to pass off its product as that of the plaintiff.

*AM Gen. Corp.*, 311 F.3d at 812.  No single factor is dispositive, but the Seventh Circuit has said that the similarity of the marks, the intent of the defendant, and evidence of actual confusion are especially important.  *Sorensen v. WD-40 Co.*, 792 F.3d 712, 726 (7th Cir. 2015)

In this case, beyond noting that both products are relatively low-priced household goods that sell for under fifty dollars each, Bodum has not pointed to any specific evidence to support its assertion that consumers are not likely to exercise a high degree of care in purchasing a French press-style coffeemaker.  Nor has Bodum produced any admissible evidence of actual confusion.[4]  Finally, Bodum pointed to no evidence that A Top intended to pass off the SterlingPro as a Bodum product.

Nonetheless, the other factors weigh in favor of finding a likelihood of confusion. First, a simple visual comparison of images of the CHAMBORD® coffeemaker and the SterlingPro—which is consistent with how they might be presented to consumers in the online marketplace—reveals a marked similarity in the overall appearance of both products, from the metal frame and feet to the plastic handle, to the metal, dome-shaped lid.  The Anders Report, which includes a side-by-side comparison between

---

[4] Testimony from Bodum's Alain Grossenbacher that he heard colleagues had talked to people who believed they had a Bodum French press when they did not, in fact, have a Bodum product appears to be inadmissible hearsay.  The Court will set this evidence aside for present purposes.

"The Original French Press Bodum" and both the three- and four-footed versions of the Sterling Pro from a number of different angles, concludes that "the shopping public would not distinguish [the] A Top product from the Bodum CHAMBORD Original French press product, since they both appear to have the same combination of visual external design elements." [5]  Anders Report ¶ 53.  Second, the area and manner of concurrent use also weigh in favor of finding a likelihood of confusion, as both products are used as French press coffeemakers and are sold nationwide on Amazon.com.  Finally, as for the strength of the CHAMBORD® trade dress, A Top does not dispute that the CHAMBORD® was "the first French press-type coffeemaker model of its kind to be sold in Europe and the United States" or that Bodum has been the exclusive distributor of CHAMBORD® French presses in the United States since 1983.  Decl. of Joergen Bodum in Support of Pl.'s Resp. to Def.'s Mot. to Exclude the Expert Testimony and Evidence of Rhonda Harper and for Summ. J. Regarding No Likelihood of Confusion or Secondary Meaning (Bodum Decl., Nov. 3, 2017) ¶¶ 3-4.

The Harper survey provides additional evidence supporting a finding of likelihood of confusion.  A Top contends that Harper did not properly calculate the net likelihood of confusion because she included responses indicating source confusion between the SterlingPro, CHAMBORD®, and one of the other three coffeemakers, and that the actual likelihood is much lower.  Keegan Decl. ¶¶ 30-31.  As previously noted, that is an issue that can and should be explored on cross-examination, but it is not one to be

---

[5] A Top argues that any attempts to rely on the similarity between the CHAMBORD® coffeemaker and the four-footed version of the SterlingPro is inappropriate because the SterlingPro was redesigned to have only three feet.  This argument fails because, as the product images in both the Anders Report and the Harper Report reflect, it is not possible to determine from most angles how many feet the products have.

decided by the Court on a motion for summary judgment. *See, e.g., Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 809 (7th Cir. 2013) ("Assuming a rational connection between the data and the opinion—as there was here—an expert's reliance on faulty information is a matter to be explored on cross-examination; it does not go to admissibility."). Lastly, two of the open-ended responses to the Harper survey provide additional circumstantial evidence of the likelihood of confusion regarding the origin of the SterlingPro. One of the survey participants who identified only the SterlingPro and "The Original French Press Bodum" stated "[t]hey both look like they are made by Bodum. I've bought 2 Bodum French presses so I am familiar with them." Harper Report at 48. Another stated, "I've seen these models from Bodum before." *Id.* at 51.

Viewing the above-referenced evidence in the light most favorable to Bodum alone, a reasonable factfinder could find the requisite likelihood of confusion. The Court therefore denies summary judgment on this point.

### 3. Secondary meaning

Finally, A Top argues that Bodum has provided no evidence from which a reasonable factfinder could conclude that the CHAMBORD® trade dress has acquired secondary meaning.

To establish secondary meaning, a plaintiff must show that, "in the minds of the public, the primary significance of [the claimed trade dress] is to identify the source of the product rather than the product itself." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 766 n.4 (1992) (citation omitted); *see also Bretford Mfg., Inc. v. Smith Sys. Mfg. Corp.*, 419 F.3d 576, 579 (7th Cir. 2005) ("[T]o prevail under § 43(a) the producer must demonstrate 'secondary meaning'—in other words, that consumers understand

the design elements to signify the goods' *origin* and not just its attributes.") (emphasis in original). A plaintiff can establish secondary meaning "through direct consumer testimony, consumer surveys, length and manner of use, amount and manner of advertising, volume of sales, place in the market and proof of intentional copying." *Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 291 (7th Cir. 1998) (citation omitted). The Seventh Circuit has noted, however, that "evidence of sales, advertising and use is entirely circumstantial" and that, alone, it is "often insufficient to establish secondary meaning." *Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387, 393 (7th Cir. 1992).

It is not disputed that Bodum has been the exclusive distributor of CHAMBORD® coffeemakers in the United States for over 30 years or that the CHAMBORD® coffeemaker has consistently been one of Bodum's best-selling products. Bodum also has a prominent place in the market, as it sells the CHAMBORD® French press to numerous major retailers, including Starbucks, Target, Walmart, Crate & Barrel, and Macy's. It is also undisputed that Bodum has promoted the CHAMBORD® French press, along with other Bodum products, through a variety of advertising methods including catalog, newspaper, magazine, and television advertisements, Internet marketing, and exhibitions at housewares shows. This advertising specifically touts the CHAMBORD® as Bodum's "classic, iconic, and original design," Def.'s Resp. to Pl.'s Stat. of Add'l Facts that Require Denial of Def.'s Mot. for Summ. J. Regarding Functionality, Ex. B at 5, and it refers to the Chambord French Press coffeemakers as having become "synonymous with Bodum." Bodum Decl., Nov. 3, 2017, Ex. J. In addition to this circumstantial evidence of secondary meaning, although the Harper

survey was not designed to show secondary meaning, as previously noted, two of the open-ended responses suggest that consumers understand the CHAMBORD® trade dress to signify Bodum ("[t]hey both look like they are made by Bodum. I've bought 2 Bodum French presses so I am familiar with them," and "I've seen these models from Bodum before."). Harper Report at 48, 51. Although the absence of a dedicated consumer survey or evidence that A Top intentionally copied the CHAMBORD® trade dress surely weighs against Bodum on this point, it is not the case that no reasonable jury could conclude from the above evidence that the CHAMBORD® trade dress has acquired secondary meaning. Accordingly, the Court denies A Top's request for summary judgment on the question of secondary meaning.

## Conclusion

For the foregoing reasons, the Court denies A Top's motions to exclude the expert testimony of Anders and Harper and for summary judgment [dkt. nos. 88 and 91]. The case is set for a status hearing on January 4, 2018 at 9:15 a.m. to discuss the possibility of settlement as well as the possible need to move the currently scheduled trial date of February 26, 2018.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: December 28, 2017